SNODGRASS, ADMX., *v.* THE CLEVELAND CO-OPERATIVE COAL CO.

471

(Decided March 18, 1929.)

*Mr. J. C. Logue,* for plaintiff in error.
*Messrs. Dustin, McKeehan, Merrick, Arter & Stewart,* for defendant in error.

LEVINE, J. The parties appear in this court in the same order in which they appeared in the trial court. The plaintiff is the administratrix of the estate of Robert Snodgrass, deceased, and brought this action against the defendant company, and one

Lorenzo Adams, to recover damages for wrongful death caused by the negligence of the defendants. It is alleged in the petition in substance that Lorenzo Adams was an employee of the codefendant company; that he was engaged in behalf of his employer, the Cleveland Co-operative Coal Company, in the task of delivering coal; that at the time of the accident he was on his way to the company's plant to get another load of coal. While so on his way, it is asserted in behalf of plaintiff, a collision occurred between the truck driven by Lorenzo Adams and a motorcycle which the deceased was then riding; that Lorenzo Adams, without giving any warning, at an unreasonable rate of speed, had suddenly turned into a street known as Congress Court, directly in the path of the motorcycle; that in said collision the decedent, Robert Snodgrass, who was riding the motorcycle, came in contact with some part of the truck, and was instantly killed.

After the plaintiff introduced evidence and rested, the trial court sustained a motion of defendant for a directed verdict in favor of the defendant, and entered judgment accordingly. The ground upon which the trial court directed a verdict for the coal company was that it appears from the evidence, as a matter of law, that Lorenzo Adams was not an employee of the coal company, but was, instead, an independent contractor. Thereupon the plaintiff dismissed the case as against Lorenzo Adams and entered an exception to the ruling of the court. We must look, of course, to the record, and, after giving the evidence introduced in behalf of plaintiff the most favorable construction, determine from that whether the operative facts so appearing upon the

record establish the relation of independent contractor between Lorenzo Adams and the Cleveland Co-operative Coal Company.

It appears that the Cleveland Co-operative Coal Company was engaged in the business of delivering coal, and had several yards, and that the one at which Lorenzo Adams worked was in the vicinity of East Eighty-Ninth street and Woodland avenue. The company owned no trucks; but engaged men who owned their trucks, and these men delivered the coal at so much per ton. Lorenzo Adams owned his own truck. There was no written contract of employment, but merely a verbal understanding. Quoting from the testimony of Lorenzo Adams: ''Shanks (meaning the President and Superintendent of the Company) told me that he had some coal to haul and could I haul it? I was first employed by the—can't remember it now—well, anyway, told me he had some coal to haul and give me the figures and prices. After he give me the price I told him, 'yes, I would haul it for him.' '' According to the verbal understanding Adams was to get 75 cents per ton for hauling, and the company took 3 cents out of every dollar he earned for insurance. Shanks told him this would be done when he employed him. This was some time in July, 1925, and Mr. Shanks told him to report to the foreman at the yard, which he did. The evidence shows that Adams hauled coal to the Engineers' Building, and also to domestic users, and other places, whenever and wherever directed by the foreman of the yard.

The record shows that other persons owning their own trucks at times carried coal to the Engineers' Building. This last item of evidence must be con-

sidered, because of the defendant's claim that Adams had an independent contract to carry coal to the Engineers' Building. Giving the evidence the most favorable construction, as the court is bound to do when a motion to direct is offered, it unquestionably lends itself to the inference that Lorenzo Adams carried coal not only to the Engineers' Building, but to other places, when so directed, and that other men owning their own trucks carried coal to the Engineers' Building, when so told.

On the question as to what control the coal company exercised over Lorenzo Adams the record discloses that Lorenzo Adams testified that just before the accident happened he was returning to the coal yard to get another load of coal to take down to the Engineers' Building; that the foreman, Mr. Denny, had ordered him to take coal down to the Engineers' Building; that Mr. Denny was the foreman in charge of the men at the yard. Quoting from the testimony of Lorenzo Adams:

"Q. You took orders from Mr. Denny? A. I did.

"Q. And did what he told you to do? A. I did.

"Q. It's true, isn't it, that that day, on the 4th of December, a carload of coal of the kind used by the Engineers' Building, had come in about two o'clock in the afternoon? A. Yes. * * *

"Q. You reported at the orders of Mr. Denny every morning did you not? A. I did."

On the day of the accident, which was December 4, 1925, Mr. Denny ordered Adams to take the coal down to the Engineers' Building, as a carload had just come in, and that he would have to work late that day; that he wanted to get at least four loads down that day; that Denny said that all the coal

would have to be unloaded before 2 p. m. the next afternoon; that Denny told Adams to hurry up. After the accident happened, Lorenzo Adams stated that he reported it to Mr. Denny; that Denny told him to make up a report of the accident, which he did; that he was required to make out reports of all accidents that happened.

A question was addressed to Lorenzo Adams as to whether there were other men hauling coal to the Engineers' Building, when so directed. The court sustained an objection to the question. There was read into the record that the witness would have testified in the affirmative if permitted to answer. The following question was asked Adams: "Q. Did Mr. Denny have a right to discharge you?"

The court sustained the objection to the question, and an exception was taken. There was read into the record that had Adams been permitted to answer he would have stated that Denny did have a right to discharge him.

The witness Adams stated that 3 cents out of every dollar was taken by the coal company out of his pay for insurance. The record shows that he worked for the coal company practically all the time from July, 1925, until this accident happened in December, 1925; that he reported every morning at 7 o'clock as did every other man; that he drove his own truck in hauling coal for the company, and had a sign of the Cleveland Co-Operative Coal Company on his truck, which he was ordered to put on by Denny; that the company carried him on its pay roll, and the pay was made up at the office; that the foreman made up the slips, sent them to the office to the bookkeeper, who made up the pay roll; and that

Adams and the rest of the men were paid once a week. The foreman, Bryan Denny, was called as a witness, and he testified as to the conditions under which Adams worked. He stated that he came to the yard as foreman a short time after Adams was engaged to work by the president of the company. He stated that Mr. Shanks, the president, told him that his duties were to run the yard; that he had a right to discharge the men, or any one who was not performing his duty according to directions. He also stated that when he took charge of the yard Mr. Shanks told Adams, "This is your new boss;" that he ordered Adams to put the Cleveland Co-Operative Coal Company sign on his truck; that all the men reported at 7 o'clock in the morning, including Adams; that Adams was given orders to that effect, and did so report; that Adams carried coal to the Engineers' Building, and to other consumers also; that directions were given to Adams and all other drivers that whenever an accident happened they were to report it to him as soon as they got back, and they had report blanks that had to be made out; that on the day of the accident Adams was ordered to go down to the office and make out a report slip; that 3 cents was deducted for insurance from every dollar he earned; and that other people carried coal to the Engineers' Building besides Adams.

It is urged in behalf of defendant in error that the judgment of the common pleas court in directing a verdict is correct because in addition to the evidence detailed above it appears not only that Adams was driving his own truck, but that he paid out of his pocket for the gas, oil, and upkeep of the truck which he owned; that he did general hauling at

times; that he would telephone the defendant, and if there was nothing for him to do, he would work for other people at other places; that.he himself decided the route which he took at the time the accident occurred. It is argued that upon the state of the record the relationship between Adams and the coal company became a question of law for the determination of the court. We are cited to the case of *Schickling, an Infant,* v. *Post Publishing Co.,* 115 Ohio St., 589, 155 N. E., 143, the syllabus of which reads: ''When the facts attending any issue in an action are admitted or the evidence in respect thereto is not in conflict, it is the duty of the trial court to charge the jury the result that must follow an application of the law to the facts so established; and, where the question is whether the relation of master and servant or that of independent contractor arises by reason of such facts, the trial court should say to the jury which relation exists, and it is prejudicial error to submit the determination of that question to the jury.''

It must be observed that in the case at bar the matter was taken from the consideration of the jury, and that the sole question for our determination is whether or not, construing the evidence thus far given favorably to the plaintiff, it tended to show a relationship of master and servant between Adams and the coal company. There can be no dispute as to the law. (It is well settled that one who renders service in the course of an independent occupation in representing the will of his employer only as to the *result* of his work, and not as to the means by which it is accomplished, is regarded as an independent contractor. If one submits himself to the

direction of his employer as to the details of the work, fulfilling his wishes, not merely as to the result, but also as to the means by which that result is to be obtained, he is regarded as a servant, and not as an independent contractor.) It may be stated in another way, namely, that one who contracts to do a specific piece of work, executing the work either entirely according to his own ideas, or in accordance with the plan previously given to him by the person for whom the work is done, without being subject to the orders of the latter with respect to the details of the work, is regarded as a contractor and not as a servant. On the other hand, one who is subject to the will of his employer, and who cannot properly refuse to obey his directions as to the mode in which the work is to be done, is not a contractor, but a servant. The fact that a person was engaged to do piecework, and furnished his own tools in the doing of the work, does not alter the character of the employment from that of servant to that of independent contractor.

In the case of *City of Tiffin* v. *McCormack,* 34 Ohio St., 638, 32 Am. Rep., 408, the court held, in the second proposition of the syllabus, as follows: ''The owner of a stone quarry hired a person 'to go into the quarry, quarry stone therein, break the same to a certain size, and pile them up so they can be measured,' and 'had no other or further control' over the employe, who was 'to furnish and find the gunpowder and other tools,' and receive compensation at the rate of $1 per perch; and the employe, by blasting with gunpowder, destroyed the buildings of an adjoining proprietor: Held, that the employer is liable for the injury inflicted by the employee.''

The discussion found in the body of the opinion proves most helpful in the instant case. Quoting from page 642, where the court said: "But we are of opinion that the true relation between the city, as proprietor of the stone quarry, and Ardner, was that of master and servant, instead of employer and independent contractor within the principle of the rule above stated. There was no 'job' or defined quantity of work contracted for. The services of Ardner were subject to be determined at the pleasure of either party. The compensation was to be measured by the quantity of labor performed. It appears to us to have been an ordinary contract for work and labor, which creates, between the employer and employed, the relation of master and servant, within the meaning of the law in regard to that subject. It is true that the service, namely, the quarrying of stone in the employer's quarry, was to be done by the use of powder and tools furnished by the employe; but this condition in the contract did not affect the legal relation between the parties. It was significant only as a matter affecting the rate of compensation."

The evidence presented in the case at bar fairly lends itself to the construction that the company employed Adams, who was to use his own truck, to haul coal, for and in behalf of the company, to whatever destinations he was directed to haul it; that there was no job or defined quantity of work contracted for; that the services of Adams were subject to be determined at the pleasure of either party; and that neither party in the case of a termination of the work could base a cause of action against the other as for breach of contract. The

compensation, it is true, was to be measured by the quantity of work performed. It is also true that the service, namely, the hauling of the coal, was to be done by the use of Adams' own truck; but this does not affect the legal relationship between the parties. It merely affects the rate of compensation.

The term "independent contractor" presupposes the existence of a binding contract between the parties, for a breach of which a cause of action arises. There can be no relationship of "independent contractor" without the existence of such binding contract between the parties. It is quite clear that no such contract existed between the parties in the case at bar.

We are of the opinion that the trial court misconceived the law, in holding upon the state of the record, as a matter of law, that Adams was an independent contractor. It was clearly the duty of the trial court to overrule the motion and leave the operative facts, upon which the relationship of master and servant or of independent contractor depends, to the determination of the jury, under proper instructions.

Counsel for defendant, as an additional ground for the sustaining of the decision of the common pleas court, call attention to another phase of the case. It is claimed that the admitted facts of the accident itself show that the accident was caused by the fault of decedent, Robert Snodgrass, or, to say the least, that his negligence proximately contributed to the cause of the injury so as to defeat a recovery as a matter of law. We have examined the record relative to this latter point and find that plaintiff predicates her action upon the theory that

Adams, without giving any warning, and while operating his truck at a rapid rate of speed, had suddenly turned into Congress court in such way as to obstruct the path of the decedent, Snodgrass, who was then riding his motorcycle; that Robert Snodgrass was thus placed in sudden peril or danger, and because of that his mere failure to apply the brakes to his motorcycle cannot be said to render him guilty of contributory negligence as a matter of law, so as to defeat a recovery; and that whether he exercised the degree of care which an ordinarily prudent person would exercise under similar circumstances is a question of fact for the determination of the jury. We are of the opinion that even if it be true that the decedent could have prevented the collision by applying the brakes to his motorcycle, he could not, because of the sudden and unexpected peril or danger which had arisen, be held to the same degree of care which a person not placed in such a position would be held, and that the question whether the decedent was guilty of contributory negligence, under the circumstances, was clearly a question for the determination of the jury.

We hold that the common pleas court committed error in sustaining the motion of defendant for a directed verdict in its favor.

The judgment of the common pleas court is therefore reversed, and the case is remanded for further proceedings according to law.

*Judgment reversed and cause remanded.*

VICKERY, P. J., and SULLIVAN, J., concur.