[File No. 7289]

CAROLINE BURKHARDT, Appellant, v. THE STATE OF NORTH DAKOTA, doing business as the Workmen's Compensation Bureau, and Val Messer and John Schmidt, Respondents.

(53 NW2d 394)

Opinion filed May 1, 1952

*Floyd B. Sperry* and *Hyland & Foster,* for appellant.

820

*E. T. Christianson,* Attorney General, *Paul M. Sand,* Assistant Attorney General; *Mackoff, Kellogg, Mugli & Kirby* and *Strutz, Jansonius & Fleck,* for respondents.

GRIMSON, J. Rudolph Burkhardt died from injuries received in a fall from the roof of a barn which he was helping to construct on the farm of John Schmidt near Richardton, North Dakota. The plaintiff is his widow. It is claimed on her behalf that the deceased was at the time an employee of Val Messer, an independent contractor, building the barn. Messer, however, had not complied with the North Dakota Workmen's Compensaton Act. Instead of bringing suit against him for damages plaintiff elected to file a claim for an award of compensation under the Workmen's Compensation Law, Title 65 NDRC 1943, Chap. 65–09. Hearings on said application were held by the Workmen's Compensation Bureau under the Administrative Agencies Uniform Practice Act, Chapter 28–32 NDRC 1943. Its dismissal of the claim was appealed to and affirmed by the District Court. On appeal from that judgment of the District Court to the Supreme Court it was discovered that the notice of the hearing before the Bureau had not been served on interested parties as required by law. The case was, therefore, remanded to the District Court with directions to vacate the judgment entered and to remand the case to the North Dakota Workmen's Compensation Bureau for a hearing on the claim after due notice was served on all interested parties as provided by law. See Burkhardt v. State, 77 ND 232, 42 NW2d 670.

The District Court carried out the mandate of this court and

remanded the case to the North Dakota Workmen's Compensation Bureau. A hearing was duly had before the Bureau on the claim of the plaintiff after due notice to all interested parties. The Bureau thereafter came to the conclusion that Rudolph Burkhardt at the time of the injuries resulting in his death was an employee of John Schmidt; that John Schmidt was engaged in an agricultural pursuit and that Burkhardt's employment at the time of the injury, resulting in his death, was casual. The Bureau dismissed the claim. The claimant duly appealed to the District Court asking for trial anew, alleging as error the finding of the Bureau that Rudolph Burkhardt was an employee of John Schmidt and that his employment at the time of his injury was casual *or* in an agricultural pursuit.

All of the proceedings had before the Workmen's Compensation Bureau were certified to the District Court on the appeal. Sec 28–3215 NDRC 1943. The review of the District Court is upon that record and under the statute, Sec 28–3219 NDRC 1943, the District Court is "directed to affirm the decision of the agency unless it shall find that such decision or determination is not in accordance with law . . . or that the findings of fact made by the agency are not supported by the evidence. . . ." The District Court affirmed the Bureau's dismissal of the claim. An appeal to this court was thereupon taken by the plaintiff under Sec 65–1001 NDRC 1943, demanding a trial de novo and alleging error in failing to find that the defendant Messer was an independent contractor, setting forth eight specifications in support thereof and in failing to find that Rudolph Burkhardt was employed by Messer instead of Schmidt and in failing to grant the claim of the plaintiff.

It is claimed on the part of the plaintiff that Messer was an independent contractor and that Burkhardt was working for him in the building of Schmidt's barn; that as such independent contractor Messer was subject to the provisions of the North Dakota Workmen's Compensation Act, Chap 65–09 NDRC 1943, even if he had not complied with the provisions thereof; that Burkhardt died in the performance of his duties in the course of his employment and that Mrs. Burkhardt is entitled to an award of compensation. On behalf of the appellees it is claimed that

Messer was employed by Schmidt as foreman for the building of the barn and that both Messer and Burkhardt were employees of Schmidt in casual employment or in agricultural service.

It becomes necessary, therefore, to first determine whether the conclusions of the Bureau that Messer was not an independent contractor but that both he and Burkhardt were employees of Schmidt, are supported by the evidence and are in accordance with law.

The statute does not make any definition of the term "independent contractor." The courts have applied various tests. Different factors have been cited and emphasized depending somewhat on the particular circumstances of each case. All the facts and circumstances of the particular case may be considered in making a determination of whether a workman is an employee or an independent contractor. Knuffke v. Bartholomew, 106 Neb 763, 184 NW 889; Lowe v. Chicago Lumber Company of Omaha, 135 Neb 735, 283 NW 841; 1 Schneider's Workmen's Compensation Law, 285.

"The most important test in determining whether a person employed to do certain work is an independent contractor or a mere servant is the control over the work which is reserved by the employer. Whether one is an independent contractor depends upon the extent to which he is, in fact, independent in performing the work. Broadly stated, if the contractor is under the control of the employer, he is a servant; if not under such control, he is an independent contractor." 27 Am Jur, Independent Contractors, Sec 6, p 486.

This principle has been generally approved and applied. Mutual Life Insurance Co. of New York v. State of North Dakota, 71 ND 78, 298 NW 773, 138 ALR 1115, 71 CJ 449, 58 Am Jur 670; Angell v. White Eagle Oil & Refining Co. 169 Minn 183, 210 NW 1004; Pace v. Appanoose County, 184 Iowa 498, 168 NW 916; Schlichting v. Radke, 67 SD 212, 291 NW 585; McCarthy v. City of Murdo, 68 SD 12, 297 NW 790; Nonning et al. v. Carter et al. 185 Wis 384, 200 NW 652.

This court held in Bernardy v. Beals, 75 ND 377, 28 NW2d 374:

"One of the most important tests to be applied is the right of

the employer to control not merely the result but the manner in which the work is done and the methods used in its performance. Starkenberg v. North Dakota Workmen's Comp. Bureau, 73 ND 234, 13 NW2d 395; Janneck v. Workmen's Comp. Bureau, 67 ND 303, 272 NW 188; State ex rel. Woods v. Hughes Oil Co. 58 ND 581, 226 NW 586; Lilly v. Haynes Co-op. Coal Min. Co. 50 ND 465, 196 NW 556; Kronick v. McLean County, 52 ND 852, 204 NW 839."

Another important factor and as an incident of the right of control is the right to hire and discharge workmen. Bernardy v. Beals, supra, and cases cited. A further indication to be considered in determining the relationship is the mode, method or basis of payment. Meredosia Levee & Drainage District v. Industrial Commission of Ill. 285 Ill 68, 120 NE 516. That, however, has been given less weight than some other factors. Bernardy v. Beals, supra; 71 CJ 471; Ryan v. Twin City Wholesale Grocery Co. 210 Minn 21, 297 NW 705; Finn v. Phillippi Brothers, 211 Minn 130, 300 NW 441. The fact that the work to be done is such as required special skill for its performance is a circumstance to be considered. Shannon v. Western Indemnity Co. (Tex Com App) 257 SW 522. The furnishing of tools, materials and supplies should be considered although the courts have held both ways as to the conclusiveness thereof. 71 CJ 467, 469.

Other tests which may be considered under the evidence of this case are the attitude and intention of the parties as determined from all the circumstances of the case. 58 Am Jur 670, Workmen's Compensation, Sec 138 p 670, whether the work is a part of the regular business of the employer, Nallinger v. Webster City Oil Co. 211 Iowa, 847, 234 NW 254, whether the contract contemplates labor on the job or the completion of the job or some portion thereof. Industrial Commission v. Hammond, 77 Colo 414, 236 P 1006.

The evidence discloses that John Schmidt had retired from his farm and rented it to his son. His barn was destroyed by fire. He then contacted Val Messer who testified that his name was Valentine E. Messer. Messer was a carpenter and for at least three years had been engaged in erecting barns and other build-

ings in that neighborhood. His continuance in the work shows that he had the necessary skill for erecting buildings. That was his regular occupation. Schmidt asked him to build a certain kind of barn and gave him the size. He says: "I didn't make much of a deal. I just asked him to build the barn for me and he came out in the spring with . . . two other men. They built the foundation and later on he came out and I got the lumber and they started in with the help." Messer testified: "He wanted me to put up a barn for him and he said, 'Can you get help' and I said, 'Yes, there were some in town that went along with me and put up barns and they were paid by the hour. . . .'" "Q.— Now to get this straight, Mr. Messer, it is a fact that Schmidt made a deal with you to have a barn built. Is that right? Ans.— Yes." Mr. Schmidt did not particularize how the barn should be built. Messer made all the plans in that regard and directed Schmidt what lumber to get. Schmidt furnished all the materials and the board and lodging for the men. Messer furnished the tools. Messer brought Burkhardt and another man, Heinle, along with him to build this barn. With their aid and with some help from farmers with whom Schmidt had exchanged work the barn was built. All the work was carried on under the control and direction of Messer. Even Schmidt and his son carried out Messer's orders in the work they did on the building of the barn. Messer cut the lumber and told the men what to do and how to do it. He was in complete charge. He says: "I was responsible for the job. . . ." He carried on the work to the completion of the job except for the shingling of a part of one side of the roof which could not be done for lack of shingles. There was delay in getting the shingles. Messer says: "That was why we didn't finish."

This evidence discloses an agreement between Schmidt and Messer for the building of the barn with Messer in complete charge of that work. In Starkenberg v. North Dakota Workmen's Compensation Bureau, 73 ND 234, 13 NW2d 395, this court held that: "One who contracts to construct a building for another, in accord with a stipulated plan, without being subject to the latter's superintendence, orders, or control in respect of the details of the work; who has absolute control of the work;

may work such hours as he sees fit to work, may do the work himself or employ others to assist, and is to be paid a definite, stipulated sum when the building has been fully completed, is not an employee but is an independent contractor."

That the payment was by the hour in the instant case and that Schmidt furnished some of the laborers who worked under Messer's direction does not make any difference.

An analogous situation is set forth in the case of McCarthy v. City of Murdo, 68 SD 12, 297 NW 790. There a plumber directed the progress of the work which he had undertaken to do for city and completed the work according to plans that he had made. While the work was in progress a city official was present but did not attempt to exercise any control over the plumber, who was assisted by two WPA workers furnished by city. The plumber furnished all equipment and materials and paid his helper wages for which he billed the city. The city could have terminated plumber's employment if plumber could not perform work he had agreed to perform. The plumber submitted a bill on a per diem basis. It was held that the plumber was an "independent contractor" and not an "employee."

In Kronick v. McLean County, 52 ND 852, 204 NW 839, one Aune contracted with McLean County to "' perform the duties of repairnig' the court house and county jail." He was paid seventy-five cents an hour. He hired Kronick who was paid sixty-five cents an hour. Aune had complete charge of the work under the supervision of the County Commissioners and County Auditor. It was held that the relationship of employer and employee did not exist between Kronick and the County. In Montain v. Fargo, 38 ND 432, 166 NW 416, LRA1916C 600, a garbage collector was held an independent contractor although acting under the supervision of the City Health Commissioner. It was there pointed out that a servant is one *entirely* under control of master as defined by Sec 6134 CL 1913 (Sec 34–0401 NDRC 1943) while by inference one not coming under that definition is an independent contractor. In Newman v. Sears, Roebuck & Co. 77 ND 466, 43 NW2d 411, a carpenter installing a folding bed was held an independent contractor. In Janneck v. Workmen's Compensation Bureau, 67 ND 303, 272 NW 188, a painter,

Weddell, hired for a certain paint job was held an independent contractor.

On the employment of Burkhardt the evidence shows that Messer not only kept the time of Barkhardt and Heinle whom he brought with him but that he determined how much to pay them. Both of these men were strangers to Schmidt. He never talked to them as to their employment or wages. He claims they were working for Messer. They worked entirely subject to Messer's orders. Heinle testified that he had worked for Messer on many jobs and had been usually paid by Messer direct. That he considered himself working for Messer on this job. In Dahl v. Wunderlich, 194 Minn 35, 259 NW 399, 401, it is held that there cannot be a change of masters without the knowledge and consent of the servant. Messer called for them in town, took them to the job and directed, not only the work but the hours worked each day.

On examination by Mr. Sperry, Messer testified:

"Q. Now Mr. Messer, isn't it the truth that you made this deal with Mr. Schmidt to build this barn for him and that you got these men and told them about what they would be paid?
"A. Yes.
"Q. You took these men over there after making this deal with them to help you and you told them what to do while you were building the barn?
"A. That is right.
"Q. And you kept the time?
"A. Yes."

Messer also determined the amount these men should be paid. He said:

"Q. Before you went there you told Mr. Schmidt what you were going to charge for your time and that of the men?
"A. Yes.
"Q. You told these men what they were going to get?
"A. We were doing that right along."

Messer persuaded Schmidt to draw checks direct to Burkhardt and Heinle for the amount be directed. Schmidt objected to that but finally acquiesced in Messer's request. There is some

testimony that they were paid weekly but Schmidt testified that he paid when the job was done. That was after Burkhardt's death. In either case the payment was controlled by Messer.

On this matter of wages and payment the testimony shows that Commissioner Fenelon asked Messer:

"Q. While you were working at the Schmidt place did you put in the men's time, say at sixty cents per hour, and then only pay the men fifty cents an hour? Did you have any arrangement like that?

"A. No.

"Q. In other words, you never made any profit on the men?

"A. That is the reason why I had the owner pay them. I didn't want the men to think I was making money off them. There was a fellow here in town that did get ten cents an hour for each fellow and he got into trouble. Nobody can say that I got more than the ones that worked for me."

. . .

"Q. Did you furnish tools for these men?

"A. Yes.

"Q. Did you charge them anything for the use of tools?

"A. I didn't charge the men anything but I got fifteen cents an hour more than they got.

"Q. Was this for the use of the tools?

"A. Yes."

On cross examination by Sperry, Messer testified:

"Q. Then your fifteen cents an hour that you were getting above what the others got was in what you charged for the tools?

"A. I owned the tools.

"Q. It was because you were boss of the job and you were responsible for the supervision of the work?

A. "Yes.

. . .

"Q. You did not want the Workmen's Compensation Bureau to know you were a contractor?

"A. I never was a contractor.

"Q. You were afraid that if you paid these men direct they would consider you a contractor?

"A. Yes."

Another indication of why the payment was made in this manner is found in the testimony of Frank Schmidt, who testified that during the work there was some conversation with Messer about what would happen if anybody got hurt. "I said, 'Well these men are insured for that, aren't they?' He says: 'No, they have no insurance. They did not want anything taken out of their pay, therefore, I am not taking insurance.'" Heinle somewhat contradicts that. He testified: "Q. Did you think he had insurance? A. Yes. Q. You thought he had insurance? A. Yes."

On the matter of who had the right to discharge an employee on the job the evidence shows that Schmidt denies any such right. He testified:

"Q. If Mr. Burkhardt didn't do the work right whose business was it to fire him?

"A. I had nothing to say.

"Q. That would be Messer's job?

"A. He was working for him."

Messer tried to avoid it. He says:

"Q. You could fire these men?

"A. No.

"Q. You were bossing them and if they didn't do the work you could fire them?

"A. I don't think so. They weren't working for me. They were working for someone else."

Commissioner Fenelon asked Messer:

"Q. Did you have the supervision of the work?

"A. I was responsible for the job and they left it up to me."

Mr. Sperry pursued this further:

"Q. Did you feel responsible for the way these men did the job, since you took them over there?

"A. I felt responsible for them?

"Q. Yes, for the way they did the work?

"A. No answer.

"Q. Let me ask you another question before you answer that. Say you took the job of building the barn, were responsible for it and for the work the men did and you say Mr. Burkhardt wasn't doing the work right, was breaking up the lumber and not putting the sidings right—would you fire him?

"A. Not fire him but tell him, he didn't do it that way.

"Q. But if he still continued to do it wrong, would you fire him?

"A. He wasn't that kind of a man.

"Q. If he was?

"A. I would talk to Mr. Schmidt before I fired him.

"Q. Why would you talk to Mr. Schmidt? Suppose you did talk to Schmidt and told him this man was hopeless and he told you to keep him and you were responsible for the way the barn turned out?

"A. Not in that case.

"Q. You would have the right to fire him?

"A. Yes, I guess so."

Taking those answers, together with the facts and circumstances of the case, the conclusion is that Messer did have the right to discharge an employee.

From a consideration of all the evidence it appears that Messer was engaged in a trade or occupation of building barns. He took the job of building a certain kind of barn for Schmidt. He did all the planning. He exercised complete control over the manner and the method of building said barn. Messer was responsible for the job in all respects. Messer brought Burkhardt and another man on the job. They worked under Messer's supervision. Burkhardt was hired and in effect paid by Messer. Messer had the right to discharge a workman.

The Bureau made no findings whatsoever with respect to any of the facts just stated, although they are without any substantial dispute in the record. Its only finding is the ultimate conclusion that "Burkhardt, at the time of his injury resulting in his death, was an employee of John Schmidt." There are in the record no findings of fact upon which such a conclusion could rest, nor is there in the record any intimation as to the basis

upon which the Bureau founded this conclusion. Our view is that the facts are clearly established and that they will permit no conclusion other than that Burkhardt was an employee of Messer, an independent contractor.

Chapter 65–0102 NDRC 1943 provides that casual employment and agricultural service are not covered by the Workmen's Compensation Act. The question arises whether the building of a barn is agricultural service or casual employment under the circumstances of this case. We have held that Burkhardt was an employee of Messer. Messer's business was that of erecting buildings. He was building a barn for Schmidt. That was not a casual employment but in the regular course of his business. Even if that employment was on a farm that does not make those engaged solely in that work farm laborers. The whole character of the employment shows that Burkhardt was not employed to perform ordinary farm work. He was a carpenter employed by a builder whose business it was to erect barns and other buildings. In Lowe v. North Dakota Workmen's Compensation Bureau, 66 ND 246, 264 NW 837, 107 ALR 973, this court in an opinion by Judge Burr said that a carpenter building a granary was not engaged in agriculture. That applies also to the building of a barn. Burkhardt's employment was neither casual nor agricultural. Oliver v. Ernst, 148 Nebr 465, 27 NW2d 622; Peterson v. Farmers State Bank of Eyota, 180 Minn 40, 230 NW 124.

A consideration of all the facts and circumstances shown in the testimony of the parties, leads to the conclusion that the evidence does not support the findings and conclusions of the Bureau. On the contrary it supports the contention of the plaintiff that Rudolph Burkhardt was in the employ of Val Messer, an independent contractor, and not engaged in either casual or an agricultural occupation. His widow is, therefore, entitled to an award of compensation because of the fatal injury to her husband in the course of his employment.

No findings were made by the Bureau or the District Court as to the average weekly wage of Rudolph Burkhardt. There is, however, in the record sufficient evidence upon which such a finding can be made. That finding must be made by the Dis-

trict Court. In accordance with Sec. 65–1002 NDRC 1943, the District Court shall fix the claimant's compensation within the limits prescribed by law. From the date of Rudolph Burkhardt's death, June 9, 1944, to July 1, 1945 the statute fixed the rate of such compensation for a widow at 35 per cent of the average weekly wage of the deceased not exceeding $30.00 nor less than $10.00 until she died or remarried. See Sec. 65–0517 NDRC 1943. From July 1, 1945 to July 1, 1949 that rate is fixed at 35 per cent of that weekly wage not exceeding $35.00 nor less than $25.00. See Sec. 65–0517 as amended by Sec. 6, Chapter 337 S.L. 1945. Then from July 1, 1949, the rate is 45 per cent of that wage not exceeding $35.00 nor less than $25.00. Sec. 65–0517 1949 Supp.

The judgment of the District Court is reversed and the case is remanded to the District Court with directions to find the average weekly wage of the deceased, fix the amount of compensation and to render judgment for plaintiff in accordance herewith.

MORRIS, C.J., and BURKE and SATHRE, JJ., concur.

CHRISTIANSON, J. (Dissenting). This is an appeal from a judgment of the District Court of Stark County sustaining the decision of the Workmen's Compensation Bureau denying a claim for compensation for the death of Rudolph Burkhardt, the husband of the claimant Caroline Burkhardt. Rudolph Burkhardt died on June 9, 1944, from injuries sustained by him on that day in a fall from the roof of a barn which he was shingling on the farm of John Schmidt near Richardton in this state. It is stated in the claim that at the time he sustained such fatal injury Rudolph Burkhardt was an employee of Val Messer.

At the time of the fall Burkhardt and John Schmidt, the owner of the farm where the barn was being constructed, were engaged in shingling the roof. There were also present and at work on the construction one Joe Thomas, a neighbor with whom Schmidt exchanged labor, and Val Messer. The record does not disclose what particular work Thomas was doing at the time the accident occurred, but Val Messer was engaged in painting the windows. Schmidt described the accident as follows: "I heard him and he

fell on the scaffold and from the scaffold he fell down." "He dropped over on the scaffold and then fell down." Q. "You didn't see him when he slid from where you were working? A. "No." Q. "He was on the edge?" A. "Yes." Q. "Had you just moved the planks?" A. "No not a plank a 1 x 4 they tack on." Q. "You had just moved that up?" A. "Yes." Q. "And he fell?" A. "Yes and he was half ways down when I saw him."

Adolph Burkhardt, son of the deceased Rudolph Burkhardt, was appointed administrator of the estate and letters of administration were issued to him on June 10, 1944. Adolph Burkhardt, as administrator, signed an application to the Workmen's Compensation Bureau for compensation for the death of Rudolph Burkhardt, and Caroline Burkhardt, the widow of Rudolph Burkhardt, also signed the application. The application was filed with the Workmen's Compensation Bureau on June 8, 1945. On July 13, 1945, the Workmen's Compensation Bureau rendered its decision in writing dismissing the claim for compensation. In such decision reference is made to the application for compensation, the proof of death, the undertaker's certificate of death and cost bill, the affidavit of dependency, interrogatories that had been submitted to and signed by John Schmidt; and it is stated that having examined all the records and all the papers and correspondence filed and having taken testimony and being fully advised the Bureau determined and found that the claimants had failed to prove that they were entitled to share in the fund of the Workmen's Compensation Bureau and the Bureau concluded that the claim should be dismissed for the reason that claimants had failed to prove that they were entitled to share in such fund. Thereafter claimants' attorney filed a petition for a rehearing. The petition was granted and a hearing on the claim was ordered to be had and was had on October 26, 1945. At such hearing the Workmen's Compensation Bureau appeared by its attorney, an Assistant Attorney General, and the claimants appeared by their attorney, Floyd B. Sperry, and the claimant Adolph Burkhardt appeared in person and testified. The hearing was continued until in March 1946. At the hearing then had a number of witnesses testified. The testimony then taken covers some seventy-eight pages of the typewritten transcript.

On March 28, 1946, the Workmen's Compensation Bureau rendered a unanimous decision wherein they reaffirmed the decision which they had rendered on July 13, 1945, dismissing the claim on the same grounds, namely, that the claimant had failed to establish any right to participate in the Workmen's Compensation Fund. The claimants appealed from the decision of the Workmen's Compensation Bureau to the District Court of Stark County.

The appeal was heard and tried by the district court upon the record that had been made by the Workmen's Compensation Bureau and certified to the court on such appeal as prescribed by statute. NDRC 1943, 28-3217, 28-3219. Upon the hearing in the district court claimants appeared by their attorney, Floyd B. Sperry, and the Workmen's Compensation Bureau appeared by their attorney. No question was raised as to the status of the appeal. The claimants and the Workmen's Compensation Bureau were the only parties to the appeal and they alone appeared upon the hearing in the district court. It was the contention of the claimants that Val Messer was an independent contractor and that Burkhardt was his employee and that consequently claimants were entitled to an allowance of the claim. The trial court announced his decision in a memorandum opinion wherein he discussed and analyzed the evidence with much care and arrived at the conclusion that both "Messer and Burkhardt were employees of Schmidt" and that consequently claimants had failed to sustain their burden of proof and were not entitled to a recovery against the Workmen's Compensation Bureau or the Workmen's Compensation Fund in any sum whatsoever. Judgment was entered accordingly and the claimants appealed to this court. In consideration of the appeal in this court it was found that no service had been made upon Messer of notice of the hearing to be had before the Workmen's Compensation Bureau though he had been called and testified as a witness. Under the express provisions of the statute no award can be made against an employer, who has failed to comply with the provisions of the Workmen's Compensation Act, for injuries sustained by an employee, unless notice of hearing of the claim for

compensation has been served upon the alleged employer against whom the award is sought, in the manner provided by law for the service of a summons in a civil action. NDRC 1943, 65–0902. The case was therefore remanded to the district court with directions to vacate the judgment and to remand the case to the Workmen's Compensation Bureau for hearing upon notice to the interested parties, as provided by law. Burkhardt v. State, 77 ND 232, 42 NW2d 670. Judgment was entered by the district court pursuant to such mandate of this court on May 10, 1950.

Thereafter the record was remanded to the Workmen's Compensation Bureau and notice of hearing on the claim was served upon Messer and Schmidt. The hearing came on pursuant to such notice on June 6, 1950. The claimants were represented by their attorney and the Workmen's Compensation Bureau was represented by its attorney, an Assistant Attorney General. Messer and Schmidt were also present. All the members of the Workmen's Compensation Bureau were present at the hearing. It was stipulated that all the testimony in the record "be accepted as the testimony in the case with the same force and effect as though it had been taken at this time." Messer and Schmidt, in response to questions by one of the commissioners, stated they had no additional evidence to offer at that time.

The Bureau gave the required notice of a hearing to be held on October 13, 1950. The hearing was postponed to and was held on October 27, 1950. All three members of the Workmen's Compensation Bureau were present and participated in the hearing. The claimants and the Workmen's Compensation Bureau appeared by their respective attorneys. Val Messer and John Schmidt also appeared by their attorneys. The attorney for the claimants stated that claimants would like to take more testimony and offered as a witness, Frank Schmidt, son of John Schmidt. Such witness was examined and no further testimony was offered and the matter was submitted to the Bureau. Thereafter on May 1, 1951, the Workmen's Compensation Bureau rendered its decision. In its decision the Workmen's Compensation Bureau made findings of fact that "Rudolph Burkhardt at the time of the injury resulting in his death was an

employee of John Schmidt," and that "John Schmidt was engaged in an agricultural pursuit and Mr. Burkhardt's employment at the time of the injury resulting in his death was casual." The Bureau stated as conclusions of law that the claim should be dismissed for the reason that "Rudolph Burkhardt at the time of the injury resulting in his death was an employee of John Schmidt," that John Schmidt was engaged in an agricultural pursuit and that Mr. Burkhardt's employment at the time of the injury resulting in his death was casual; and that claimant has failed to prove that she is entitled to participate in the Workmen's Compensation Fund. The claimants appealed to the district court from the decision of the Workmen's Compensation Bureau. In due course the matter came on for hearing before the district court upon the record that had been made before the Workmen's Compensation Bureau and certified to the court on such appeal as prescribed by NDRC 1943, 28-3217, 28-3219. Upon the hearing and trial in the district court the claimants and the Workmen's Compensation Bureau appeared by their respective counsel and the cause was duly submitted to the court. The court announced its decision in a memorandum opinion wherein he analyzed the evidence and questions presented at some length. · In such memorandum opinion the court held that the claimants had failed to establish that Messer was an independent contractor and that Burkhardt was his employee. In its findings of fact the court found "that when Mr. Schmidt engaged Mr. Messer he contracted for a service and not for a completed building and that both Messer and Burkhardt were employees of Schmidt," that the claimants have failed to sustain their burden of proof and are "not entitled to a recovery against the Workmen's Compensation Fund or Workmen's Compensation Bureau in any sum whatsoever" and the court ordered that judgment be entered dismissing the proceedings. Judgment was entered accordingly and the present appeal is from the judgment so entered.

The Workmen's Compensation Bureau is charged with the duty and vested with the authority to hear and determine all claims by an injured employee for compensation from the Workmen's Compensation Fund, and in the exercise of such power it

has full power and authority to hear and determine all questions within its jurisdiction. NDRC 1943, 65-0503.

"If the final action of the bureau denies the right of the claimant to participate at all in the fund on the ground that the injury was self-inflicted; or on the ground that the accident did not arise in the course of employment, or upon any other ground going to the basis of the claimant's right, the claimant may appeal to the district court of the county wherein the injury was inflicted." NDRC 1943, 65-1001.

The scope and procedure on such appeal is prescribed by NDRC 1943, 28-3219, which reads as follows:

"The court shall try and hear an appeal from the determination of an administrative agency without a jury and the evidence considered by the court shall be confined to the record filed with the court. If additional testimony is taken by the administrative agency or if additional findings of fact, conclusions of law, or a new decision shall be filed pursuant to section 28-3218, such evidence, findings, conclusions, and decision shall constitute a part of the record filed with the court. After such hearing, the court shall affirm the decision of the agency unless it shall find that such decision or determination is not in accordance with law, or that it is in violation of the constitutional rights of the appellant, or that any of the provisions of this chapter have not been complied with in the proceedings before the agency, or that the rules or procedure of the agency have not afforded the appellant a fair hearing, or that the findings of fact made by the agency are not supported by the evidence, or that the conclusions and decision of the agency are not supported by its findings of fact. If the decision of the agency is not affirmed by the court, it shall be modified or reversed, and the case shall be remanded to the agency for disposition in accordance with the decision of the court."

The above quoted statutory provision was enacted as part of Chapter 240, Laws 1941, commonly known as Administrative Agencies Uniform Practice Act, and became effective March 17, 1941. Said Chapter 240 wrought fundamental changes in the scope of review and the procedure on appeal from a determination of the Workmen's Compensation Bureau. The Workmen's

Compensation Act was enacted in 1919, Laws 1919, Ch. 162. It provided that where the final action of the Bureau denies the right of the claimant to participate at all in the Workmen's Compensation Fund upon any ground going to the basis of the claimant's right, the claimant may appeal to the district court of the county wherein the injury was inflicted. It also provided that either party should have the right to prosecute error "as in the ordinary civil cases," and thus obtain a review of the judgment of the district court in the supreme court. Laws 1919, Ch. 162, Sec. 17. Under the Workmen's Compensation Act as originally enacted an appeal from the decision of the Workmen's Compensation Bureau to the district court was not tried in the district court upon the evidence introduced and record made on the hearing before the Bureau. The case was tried anew in the district court upon pleadings filed "according to the rules of civil procedure." Witnesses appeared and testified in the district court and the determination of the district court was made upon the testimony and evidence adduced in that court. Laws 1919, Ch. 162, Sec. 17. On appeal to the supreme court from a decision of the district court in a proceeding under the Workmen's Compensation Act, the case was reviewed in the supreme court in the same manner and to the same extent as on an appeal from a judgment in an action properly triable to a jury but tried to the court without a jury, and the court might weigh the evidence to the extent of ascertaining whether the findings were or were not clearly opposed to the preponderance of the evidence. Gotchy v. Workmen's Compensation Bureau, 49 ND 915, 928, 194 NW 663. The original enactment remained in force without change both as to the procedure and scope of review on appeal to the district court and on appeal to the supreme court, until in 1935 when the scope of review on appeal to the supreme court was changed so as to provide that "Either party shall have the right to prosecute error as in the ordinary civil cases, and appeals to the Supreme Court in such cases shall be triable de novo." Laws 1935, Ch. 286, Sec. 6. The procedure and scope of review on appeal from a determination of the Workmen's Compensation Bureau to the district court were not changed and remained as provided in the original enactment, until the en-

actment of Chapter 240, Laws 1941; but this latter statute made fundamental changes in the procedure and scope of review, both as to appeals to the district court from a determination of the Bureau and as to appeals to the supreme court from a decision of the district court. Under the procedure prescribed by said Chapter 240, Laws 1941, and which has prevailed since said Chapter 240 became effective, in proceedings for compensation under the Workmen's Compensation Act all evidence must be adduced upon the hearing before the Workmen's Compensation Bureau. The statute provides that after an appeal has been taken to the district court from a determination of the Workmen's Compensation Bureau, the Bureau shall prepare and file in the office of the clerk of the district court in which the appeal is pending the original or a certified copy of the entire proceedings before the Bureau, or such abstract of the record as may be agreed upon and stipulated by the parties, including transcripts of all testimony taken. NDRC 1943, 28–3217. And that on the trial and hearing of such appeal, "the evidence considered by the court shall be confined to the record filed with the court." NDRC 1943, 28–3219.

Where on an appeal to the district court the findings of fact made by the Workmen's Compensation Bureau are challenged on the ground that they are not supported by the evidence, the scope of inquiry and review by the district court is specifically limited to the question whether the evidence before the Bureau and certified as a part of the record on appeal shows that the findings of fact made by the Bureau are or are not supported by the evidence. The mandate of the statute is that "the court shall affirm the decision of the agency (Workmen's Compensation Bureau) unless it shall find . . . that the findings of fact made by the agency (Workmen's Compensation Bureau) are not supported by the evidence." NDRC 1943, 28–3219. Under this statute the courts may not substitute their judgment for findings of fact made by the Workmen's Compensation Bureau. They are not authorized to make an independent determination on all the evidence as upon a trial de novo, and "the judicial inquiry into the facts goes no farther than to ascertain whether there is evidence to support the findings." 42 Am Juris 645;

Harvey Coal Corp. v. Pappas, 230 Ky 108, 18 SW2d 958, 73 ALR 473; Wisconsin Labor Relations Board v. Fred Rueping Leather Co., 228 Wis 473, 279 NW 673, 117 ALR 398; Pine v. State Ind. Commission, 148 Okla 200, 298 P 276, 78 ALR 1287; Pigeon's Case, 216 Mass 51, 102 NE 932, Ann Cas 1915A 737; Patrick v. J. B. Ham Co. et al, 119 Me 510, 111 A 912, 13 ALR 427; Lewis v. Ind. Commission et al, 178 Wis 449, 190 NW 101, 25 ALR 139; McCarthy v. General Electric Co., 293 Pa 448, 143 A 116, 60 ALR 1288.

In Federal Trade Commission v. Standard Edu. Society, 302 US 112, 82 L ed 141, the court said:

"The courts do not have a right to ignore the plain mandate of the statute which makes the findings of the Commission conclusive as to the facts if supported by testimony. The courts cannot pick and choose bits of evidence to make findings of fact contrary to the findings of the Commission."

In proceedings before the Workmen's Compensation Bureau under Chapter 240, Laws 1941 (NDRC 1943, 28–3210—28–3222) the members of the Workmen's Compensation Bureau are the triers of the facts. They see and hear the witnesses and have an opportunity to observe their demeanor and the manner in which their testimony is given, and incidents which may have a bearing upon the credibility of the witnesses, and in some instances upon the meaning of their testimony and the weight to be given thereto, precisely the same as has a jury when a case is tried to the jury or a trial judge when a case is tried to the court. On appeal to the district court the hearing and trial in the district court is had upon the transcript of the testimony adduced before the Workmen's Compensation Bureau. No witnesses appear and the district court has no opportunity to observe the witnesses while testifying. The court has before it only the cold paper record of the transcript of the testimony and according to the specific terms of the statute "the evidence considered by the court shall be confined to the record filed with the court." NDRC 1943, 28–3219. In considering the effect of findings of triers of fact who had an opportunity to see and hear the witnesses, and the natural limitations upon the scope of review of

such findings and of the evidence adduced before the triers of fact by an appellate court, this court has said:

"Every practioner of extended experience knows how absolutely essential it is, in order to ascertain the truth from parol evidence, that the tribunal who is to pass upon the evidence should see the witness upon the stand. The printed page containing the evidence gives, oftentimes, a radically different impression from that made at the hearing. The opportunity of observing the witnesses, and their interest or lack of interest in the case, their prejudices and passions, their mental capacities and powers of observation and memory, and the use they have made of these powers, their entire deportment on the stand, and conduct under cross-examination,—these and many other circumstances that attend personal observation,—are undoubted auxiliaries in ascertaining truth. Of all these helps this court is deprived, while the trial court possesses them fully. It is obvious that, if these things be disregarded, mistakes will be made, and injustice be done. As the finding of fact based upon parol evidence comes to us with all presumptions in favor of its correctness, we must, in reaching our conclusions, throw into the balance in support of the finding, not only the full effect of the printed evidence in the bill of exceptions, but also the full effect of the inferences and impressions that might reasonably and legitimately be drawn from personal observation of the witnesses; and it is only when the scales unmistakably incline the other way, when the finding is thus weighed, that we are warranted in disturbing it." Jasper v. Hazen, 4 ND 1, 5–6, 58 NW 454.

It seems obvious that in proceedings before the Workmen's Compensation Bureau under Chapter 240, Laws 1941 (NDRC 1943, 28–3210—28–3222) questions as to the credibility of witnesses who appear and testify before the Bureau and the weight to be given to their testimony are for the Bureau, and that on appeal to the district court from the determination of the Bureau the court has no more authority to disturb the findings of the Bureau on the ground that the same are not supported by the evidence than it would have had to disturb the verdict of a jury if the same question and the same evidence had been sub-

mitted to a jury and the same determination had been made by the jury as was made by the Workmen's Compensation Bureau. Wisconsin Labor Relations Board v. Fred Rueping Leather Co., supra; Harvey Coal Corporation v. Pappas, supra; Pigeon's Case, supra; Patrick v. J. B. Ham Co. et al., supra; Lewis v. Ind. Commission et al., supra; National Labor Relations Board v. Link-Belt Co., 311 US 584, 85 L ed 368; Geipe Inc. et al. v. Collett, 172 Md 165, 190 A 836, 109 ALR 887.

In Harvey Coal Corporation v. Pappas, supra, it was contended that the findings of fact by the Workmen's Compensation Bureau were flagrantly against and contrary to the evidence; and that there was no evidence to support the award. The court held that it was not the province of the court to weigh the evidence and to ascertain whether the decision of the board was in accord with the preponderance of the evidence; that "the finding of fact by the Workmen's Compensation Bureau is conclusive, where there is any evidence to support the finding." National Labor Relations Board v. Link-Belt Co., supra, involved an order of the National Labor Relations Board. The statute provided: "The findings of the Board as to the facts, if supported by evidence, shall be conclusive." The court held that the statute "entrusted the Board, not the court to draw inferences from the facts," and that the Board had "the function of appraising conflicting and circumstantial evidence, and the weight and credibility of testimony." 311 US at p 597, 85 L ed at pp 377–378.

In Wisconsin Labor Relations Board v. Fred Rueping Leather Co., supra, the court had under consideration the effect of findings of the Wisconsin Labor Relations Board, under a statute which provided "The findings of the board as to facts, if supported by the evidence in the record, shall be conclusive." It was contended that there was no substantial evidence to support the findings of the Board. The court said: "The requirement is that there must be some evidence tending to support the finding of the board, and, if this is discovered the court may not weigh the evidence to ascertain whether it preponderates in favor of the finding." 228 Wis at p 494.

Where on an appeal to the district court from a determination

of the Workmen's Compensation Bureau the determination of the Workmen's Compensation Bureau is challenged on the ground that the findings of the Bureau are not supported by the evidence the district court renders decision sustaining the determination of the Bureau against the attack made upon its findings of fact and an appeal is taken to the supreme court from the judgment of the district court, the supreme court must give due weight to the decision of the district court (42 Am Jur, Public Administrative Law, Sec. 213, p. 634), and the court is restricted to a consideration of the question whether the district court erred in holding that it had not been shown that the findings of the Bureau were not supported by the evidence.

The transcript of the evidence adduced before the Workmen's Compensation Bureau and certified to the district court as a part of the record on the appeal from the determination of the Workmen's Compensation Bureau shows that John Schmidt owned a farm near Richardton in Stark County. He had rented the farm to his son Frank on a share basis. In the winter of 1943–44 the barn on the farm burned. Frank Schmidt testified that after the barn burned he and his father decided that a new barn should be built, and that they selected a new location for such barn. He testified also that his father and his stepmother were living in town but that his father and he worked together and that his father came to the farm regularly and during the busy season was there every day and did "anything that came up." He also testified that during the working season his father would spend the nights at the farm; that he had his bedroom reserved in the main part of the house. He also testified that he did some work in the construction of the barn and that he (Frank) and his wife prepared the meals for the men who were working on the construction of the barn. As to the arrangement with Messer relating to the contemplated construction of a barn John Schmidt testified that he went to see Messer and was in Messer's house at Hebron; that he had heard and knew that Messer was a carpenter. In response to questions propounded by counsel for the claimants he testified:

"Q. You went over there to see him for the purpose of getting him to build a barn for you? A. Yes.

"Q. What kind of a deal did you make with Mr. Messer?

"A. I didn't make much of a deal. I just asked him to build the barn for me and he came out in the spring with three men— two—he and two other men. They built the foundation and later on he came out and I got the lumber and everything and they started in with the help."

John Schmidt testified that he helped build the foundation. He also testified:

"Q. Had you said anything to Mr. Messer about getting help?

"A. He said he had two men—he said these men worked for him three years already.

"Q. One was the man who was killed?

"A. Yes. He came with two. Of course I had some help from my neighbors. I helped them build and they helped me build. I didn't pay them.

"Q. Messer brought them over without your knowing either of them?

"A. He said he would bring them over. He was building barns before."

He also testified:

"Q. You paid Mr. Messer by the hour—by the hour all the way through?

"A. Yah. I paid him, I guess it was seventy-five cents an hour. Of course I didn't figure, he had the figures. I paid him in full.

"Q. You told Messer what kind of a barn you wanted him to build? A. Yes.

"Q. Was it a hip roof barn? A. Yes.

"Q. After you told him about what you wanted, he helped you figure out the lumber? Did he draw a picture of it for you?

"A. No. I just wanted a barn so-and-so.

"Q. You told him the size of it. A. Yes."

He testified that Messer cut the lumber, that he bossed the job

and kept record of the time and told the men how to do some of the work. He also testified:

"Q. He gave you the figures and told you how much to make a check for to him and how much to make a check out for Mr. Burkhardt and how much to make a check out for Heinle?

"A. That is right.

"Q. You did it the way he told you to do?

"A. Yes."

He testified that it was his understanding that he was to pay everything and that he made out some checks. That he told Messer he "shouldn't do it that way" and he (Messer) said it made no difference that it was all right. He further testified that at the time of the accident one of the neighbors by the name of Joe Thomas was at work. He also testified:

"Q. How did you pay him?

"A. I didn't pay him, he helped me. I helped him build a house and he helped me back.

"Q. You helped Mr. Thomas and the work he did on your barn was repaying you?

"A. Yes. I helped him and he helped back. The same with Peters. He built a barn and I helped him and he helped me back."

Schmidt further testified that Messer and the two men who came with him were furnished board and lodging; that they stayed at the farm and usually went home Friday. He further testified that he furnished them with board without charge. He said, "We made out that we would furnish the meals." He further testified that he did not have sufficient shingles to complete the roof. He testified, "Q. You didn't complete the work because of the shingles? A. Yes. We didn't have shingles enough. We had half a side and put them on later." The testimony of Schmidt with respect to the inability to complete the roof for lack of shingles was corroborated by Messer. The uncontradicted testimony shows that when the work stopped because of lack of shingles Messer informed Schmidt of the amount owing to Messer, Burkhardt and Heinle for the work they had performed

and that Schmidt drew his checks payable to such parties for the amounts so owing. The undisputed testimony also shows that Messer was not present when the shingling of the roof was completed and he had nothing to do with the construction after the work stopped for lack of shingles.

Messer testified that he lived on a farm until about five years ago when he moved to Hebron. That after he moved there, he started to do some carpenter work, also that he worked as an auctioneer and had been working as an auctioneer since 1936–1937. When asked whether he started contracting to do carpenter work after he moved to town he answered, "To do carpenter work. Never contracting until last summer on two jobs I did." He testified that he made a deal with Schmidt of Richardton to build a barn and that he talked to Schmidt about hiring help.

"Q. Just what deal did you have with Mr. Schmidt with regard to hiring help?

"A. He wanted me to put up a barn for him and he said can you get help and I said yes there were some in town that went along with me and put up barns and they are paid by the hour.

"Q. Who paid them?

"A. Schmidt did. . . .

"Q. You hired Mr. Burkhardt to go with you?

"A. No.

"Q. Who did hire him?

"A. Schmidt.

"Q. Did Schmidt talk to him?

"A. No, he went along with me—he was looking for work.

"Q. When he got to the farm he then talked to Schmidt?

"A. Yes. . . .

"Q. Did you keep any time or records of the pay?

"A. I always kept time. They left it up to me. I took a piece of a paper and at the end of the week they got paid and I threw it away at the end of the week.

"Q. So at the present time you have no record at all?

"A. No, just down for the week and we got paid and that is the only time I kept."

·He testified that he furnished the .tools and that he received fifteen cents an hour for the use of the tools. That he was hired as foreman for Schmidt. In response to questions by claimants' attorney Messer testified that he helped construct a creamery at ·Hebron, but that he was not the head carpenter. "Q. And after that you took the Oscar Yeager job? A. I guess that is right." (This testimony,—relating to the work on the creamery and for Oscar Yeager,—referred to times prior to the work on the·construction of the barn for Schmidt.) He ·further testified in response to questions by claimants' attorney:

"Q. And after that you took the OscarYeager job?
"A. I guess that is right."

He further testified that he talked to Schmidt in town:

"Q. And he asked if you could build the barn for him?
"A. Yes."

He testified also that they worked on the barn not quite three weeks and did not finish the building because they were short of shingles. He testified, also, in response to questions by claimants' attorney:

"Q. Before you went there you told Mr. Schmidt what you were going to charge for your time and 'that of the men?
"A. Yes.
"Q. You told these men what they were going to get?
"A. We were doing that right along."

He further testified:

"Q. And isn't it a fact that in the agreement you had with Mr. Schmidt to build the barn you were to fix and pay the help?
"A. Fix and pay the help?
"Q. That is right?
"A. No.
"You say that isn't right and if Mr. Schmidt testified that that was wrong—
"A. I didn't—what was it—that I hired the help and paid it.
"Q. Yes.
"A. No,

"Q. You claim you never took any contract job until the last year or so?

"A. Yes."

He further testified that he made no profit on the labor of any of the men working on the job, that they all received the full amount that Mr. Schmidt was to pay and paid and .that he (Messer) received the same pay as the other men with fifteen cents an hour added for the use of the tools. He testified:

"Q. Did Mr. Schmidt have the right to fire?

"A. Yes.

"Q. Regardless of what you said, he could say that you couldn't work there? A. Yes."

In response to questions by claimants' attorney he testified:

"Q. You could fire these men?

"A. No.

"Q. They didn't know about the job until you told them about it?

"A. No.

"Q. You were bossing them and if they didn't do the work you could fire them?

"A. I don't think so. They weren't working for me. They were working for someone else. . . .

"Q. Then your fifteen cents an hour that you were getting above what the others got was what you charged for the tools?

"A. I owned the tools.

"Q. It was because you were boss of the job and you were responsible for the supervision of the work?

"A. Yes. . . .

"Q. How do you figure Mr. Schmidt could have fired these men when you hired them yourself and you took them out and they were working for you?

"A. He paid them.

"Q. But he paid them in that way because you told him to make out the checks that way?

"A. That is right. . . .

"Q. Didn't you feel responsible for the way these men did the job, since you took them over there?

"A. I felt responsible for them?

"Q. Yes, for the way they did the work?

"A. (No answer)

"Q. Let me ask you another question before you answer that. Say you took the job of building the barn, were responsible for it and for the work the men did and you saw Mr. Burkhardt wasn't doing the work right, was breaking up the lumber and not putting up the sidings right—would you fire him?

"A. Not fire him but tell him. He didn't do it that way.

"Q. But if he still continued to do it wrong, would you fire him?

"A. He wasn't that kind of a man.

"Q. If he was?

"A. I would talk to Mr. Schmidt before I fired him.

"Q. Why would you talk to Mr. Schmidt? Suppose you did talk to Schmidt and told him this man was hopeless *and he told you to keep him* and you were responsible and you were responsible for the way the barn turned out.

"A. Not in that case.

"Q. You would have the right to fire him?

"A. Yes, I guess so."

Claimants called as a witness one Oscar Yeager to whom reference had been made by claimants' counsel in questions propounded to Messer. Yeager testified that he was acquainted with Val Messer and that Messer did some carpenter work for him in 1943. That he (Yeager) had bought a new farm and wanted the buildings overhauled. He testified in response to questions asked by claimants' counsel:

"Q. You had bought a new farm and you wanted the building overhauled?

"A. That is right.

"Q. Did you first make a deal for the work with Messer?

"A. Yes, I spoke to Messer first.

"Q. Did he supervise the work?

"A. Yes, I think he did. He had the tools.

"Q. He furnished most of the tools?

"A. Yes.

"Q. It was your understanding that he took the job?

"A. Yes, I told him how I wanted it to be.

"Q. And he told the rest of the men how to do it?

"A. Yes.

"Q. Mr. Messer kept the books and kept track of the hours?

"A. Yes. I asked him to keep track of the time. They agreed on it that one was to keep track. That was one thing I wanted to know, who was going to be responsible for the time.

"Q. Did you depend on Mr. Messer to keep a record of the number of hours that each of the helpers worked?

"A. That is right.

"Q. Did you pay Mr. Messer by the hour for his work and the helpers by the hour for their work?

"A. That is right.

"Q. As you recall it you paid Mr. Messer seventy-five cents an hour?

"A. That is right. . . .

"A. The reason he got more was because he had the tools. . . .

"Q. Did you talk to Messer alone about wages?

"A. No.

"Q. As a group?

"A. The whole group before they started. I had to go out to work. That was in the spring and I wanted to know who was keeping the time and wanted to know how much each was getting. As much as I know Messer was getting ten cents more.

"Q. Did you pay each one of them separate?

"A. That is right.

"Q. By check?

"A. By check.

"Q. Did you have the right to fire any of them if they were not doing the work right?

"A. I felt that way about it.

"Q. For instance, if you felt in this case that Mr. Burkhardt

was not doing his work could you go and discharge him without talking to Messer?

"A. Well—that is—if I wanted to fire employees I would do my own firing.

"Q. You felt you had hired Mr. Burkhardt the same as you hired Mr. Messer and you could fire either one of them?

"A. That is right, if I hadn't had the hiring of the men then I would have had to take it up with him.

"Q. You expected Mr. Messer to tell each one of these men what to do?

"A. That much I would expect.

"Q. And you expected him to be responsible for the fine work —that is, the way the job was finished?

"A. Well, I tell you. When you take a bunch of men like these fellows—that is the first time he was a carpenter—in fact they were all new carpenters so you couldn't—

"Q. That is why you looked to one man to be responsible for it?

"A. Yes, I was going to make my complaints to him.

"Q. You would make your complaints to Mr. Messer?

"A. I imagine I would.

"Q. You would tell him how you wanted it done and he in turn would tell the men?

"A. Yes."

In the claim filed by the claimants with the Bureau it is alleged that the injuries were sustained by Rudolph Burkhardt while he was working as an employee of Val Messer. In the course of the hearing before the Bureau it was asserted in support of or as a basis for the claim that Rudolph Burkhardt was an employee of Val Messer and that Val Messer was an independent contractor. The claimants had the burden of proof as to both of the contentions thus advanced. The burden rested upon the claimants to establish every essential element or requisite of the claim that Rudolph Burkhardt sustained injury resulting in his death while in the performance of work as an employee of Val Messer: NDRC 1943, 65–0111; 58 Am Jur, Sec 433, p 856; Pace v. North Dakota Workmen's Compensation Bureau, 51 ND 815, 201 NW

348. The claimants likewise had the burden of proving that Messer was an independent contractor. LeBree v. Dakota Tractor and Equipment Co., 69 ND 561, 565–566, 288 NW 476, 479; 27 Am Jur, Independent Contractors, Sec 59, p 538; Re Dobson, 124 Me 305, 128 Atl 401, 42 ALR 603.

"The relationship of contractee-independent contractor presupposes a binding contract between the parties" (57 CJS, Master and Servant, Sec 580, p 352) and "in determining whether the relationship between the parties is that of master and servant or contractee and independent contractor, resort must be made in the first instance to the contract between the parties." 56 CJS, Master and Servant, p 47.

In Snodgrass v. The Cleveland Co-Operative Coal Co., 31 Ohio App 470, 480, 167 NE 493, 496, the court said: "The term 'independent contractor' presupposes the existence of a binding contract between the parties, for a breach of which a cause of action arises. There can be no relationship of 'independent contractor' without the existence of such binding contract between the parties."

A person who desires to have a building constructed has the right to exercise control and direction over the work. Where he enters into an agreement with some person to construct the building or to perform certain work in such construction, he may, of course, retain such right or he may surrender the right of control in whole or in part to the person with whom he contracts. Whether the owner, the person for whom the building is to be constructed, has retained the right of control which he possessed or whether or to what extent he has surrendered the same to the person whom he has engaged to work is a matter to be determined from the contract of employment. 71 CJ 456. Where the agreement between the parties is silent as to control, it is presumed that the employer, that is, the person for whom the work is being done, has reserved the right of control. Mallinger v. Webster City Oil Co., 211 Iowa 847, 234 NW 254; Franks v. Carpenter, 192 Iowa 1398, 186 NW 647; Kaus v. Unemployment Compensation Com., 230 Iowa 860, 299 NW 415. See also NDRC 1943, 65–0103. In the absence of any express provision in the agreement negativing the right of control and

direction by the person for whom the work is being done it presumptively exists, and the nonexistence of such right must be established by the party who asserts that the person for whom the work is being done has relinquished and surrendered the right of control. George et ux. v. Chaplin et al., (Calif) 279 Pac 485, 487; Press Publishing Co. v. Industrial Accident Commission, 190 Calif 114, 210 Pac 820; 71 CJ 456.

What was the contract between Schmidt and Messer and under what circumstances was it made? The agreement was wholly oral. Schmidt owned a farm some distance from Richardton in Stark County. The barn on this farm burned during the winter of 1943–44. Schmidt decided to rebuild it. He had heard of Val Messer and knew that he was a carpenter. What he had heard of Messer apparently was favorable, for he went to see Messer at his home in Hebron to procure his services as a carpenter in the building of the barn. Schmidt had worked for some of his neighbors on an exchange of labor basis so that he already had arranged for certain men to work in constructing the barn. He also intended to be present and to work at such construction himself. Messer was not a contractor and had never contracted for the construction of any buildings. But he had worked as a carpenter and had acted as a foreman or crew boss of small crews in the construction of farm buildings. Messer had carpenter tools sufficient not only for his own use but also to supply the needs of other workers. Schmidt went to see Messer for the purpose of getting him to come and build the barn. There was no discussion of the probable cost. Messer was to be compensated solely on an hourly basis for the hours that he actually worked. Under the terms of their agreement Messer was to be compensated and would be compensated only for the hours that he performed personal service in the building of the barn. He was to receive the same hourly pay as other men who worked on the construction for wages, and in addition thereto fifteen cents an hour for the use of the tools which he had and which would be used by other men working on the construction—both the men who came along with Messer and the neighbors who worked on the exchange basis. It was understood that Schmidt would be present when the work was being done and would participate in

the work, and he thus would have an opportunity to observe what was being done and the capacity of the men who worked. Nothing was said in the agreement with respect to the right of control or direction of the workers in the construction of the barn. Nothing was said that Schmidt would surrender the right of direction and control which he possessed to Messer or that Messer would have the right of direction and control. Schmidt was to furnish all the materials necessary in the construction. When Messer came to the Schmidt farm he brought with him two men, namely, Burkhardt and Heinle, as Schmidt had requested or at least had suggested that he do. Schmidt had selected a site for the barn and Schmidt testified that he had told Messer what kind of a barn he wanted to have built. That it was to be a hip roof barn; that he "just wanted a barn so-and-so" and told Messer the size of it. Schmidt testied that after the arrival of Messer and the two men who accompanied him they proceeded to construct the foundation for the barn and that Schmidt entered upon and participated in the work. When asked what deal he made with Schmidt with regard to hiring help, Messer stated Schmidt "wanted me to put up a barn for him and he said can you get help and I said yes there were some in town that went along with me and put up barns and they are paid by the hour." Messer testified that he had done carpenter work but had never contracted until on two jobs in the summer of 1945—more than a year after his talk with Schmidt. He denied that under the agreement with Schmidt he was "to fix and pay the help" and denied that he could discharge any of the men working on the construction, but that Schmidt paid them and had authority to discharge them. Messer testified also that he kept record of the time the men worked and that at the end of each week he gave to each worker a slip of paper showing the number of hours he had worked and that he asked Schmidt to issue checks to each worker for the amount of his pay so as to avoid any suspicion that he (Messer) was making a profit on the labor of any of the other workers.

Nothing was said in the conversation between Schmidt and Messer when the arrangement was made relating to the building of the barn as to the control and direction. Nothing was said

indicating that Schmidt would surrender the right of control and direction which he had. Messer was not a contractor but a carpenter. Schmidt was not looking for a contractor, he was looking for a carpenter. Schmidt desired to procure the personal services of Messer to do work on premises owned and controlled by Schmidt. Schmidt was to furnish all the materials required in the construction of the building. He already had arranged for some employees,—certain neighbors to work on the construction. He expected to be present and perform labor himself in the construction of the barn. Schmidt knew he would have an opportunity to observe the work as it progressed and if he desired to give any directions he would be in a position to do so. He had an opportunity to observe the performance of the men in the course of the construction. There can be no doubt that if Schmidt had desired to give and had seen fit to give a particular direction his words would have been obeyed. If he had desired to discharge Messer or to stop the work altogether Mr. Messer would have recognized his right to do so. It is apparent however, from Mr. Schmidt's testimony that he had no complaint to make of any of the work that had been or was being done or of the men who were working. He spoke in terms of commendation of Burkhardt and his work. Schmidt chose Messer because he desired his personal services. He apparently was of the belief that Messer was better qualified and had a better understanding of the work than he had himself and there is not one word of complaint or adverse criticism by Schmidt as to the work that Messer performed. Under the agreement Messer was employed and paid wages on an hourly basis. Schmidt could have stopped the work and terminated Messer's services at any time he saw fit to do so without any liability. Schmidt furnished all the materials. He could have stopped the work at any time by failing to provide the necessary materials. In fact, Messer's services were terminated before the building had been finished because Schmidt was unable to obtain and furnish the necessary shingles to finish the roof. According to Schmidt's testimony there was no reason for exercising any control or giving any directions or to interfere with what the workers were doing.

"In determining whether a person doing work for another is

an employee, within a compensation act, or an independent contractor, the significant or ultimate question is not whether the party for whom the work is being done actually exercises control over the worker, the work, or the manner or method of doing it, or actually directs, instructs, or supervises, but the real question is whether such party has the right, or power, to control, direct, instruct, or supervise. Actual interference by the employer with the work or control is not the test, nor is actual regulation of the details of the work or the giving of instructions; it is the right to interfere that determines." 71 CJ Sec 185, pp 455–456.

"It is the power of control, not the fact of control that is the principal factor in distinguishing a servant from a contractor." State ex rel. Woods v. Hughes Oil Co., 58 ND 581, 597, 226 NW 586, 592–593; LaBree v. Dakota Tractor and Equip. Co., 69 ND 561, 569, 288 NW 476, 481.

"The final test is not the actual exercise of the power of control, but the right of the employer to exercise power of control." Henry v. Mondillo, 49 RI 261, 264, 142 Atl 230, 232.

While Schmidt had assisted one or more of his neighbors in constructing a barn he apparently desired to procure the services of Messer because of his belief that Messer was more familiar with the work to be done than Schmidt or any of the neighbors with whom he had arranged to exchange labor. It is not strange that in the circumstances Schmidt should not have sought to exercise any control or give any directions. Schmidt's testimony discloses that he was entirely satisfied with the performance of Messer and the other men who worked on the building and with the progress that was made of the work. In Rosedale Cemetery Ass'n. v. Industrial Accident Comm., 37 Calif App 706, 708, 174 Pac 351, 352, the court said:

"The fact that there was no right of control cannot be predicated upon an absence of the exercise of it, in practice, if the contract in fact allows the right. The employer would be very likely to refrain from exercising a direction or control over an employe as to whom he had the undoubted right of control, merely because the employe had a greater knowledge concerning the nature of the work to be done than did the employer himself."

"One may be a servant though . . . so much more skilled

than the master that actual direction and control would be folly, for it is the right to control rather than the exercise of it that is the test." McDermott's Case, 283 Mass 74, 77, 186 NE 231, 233.

In C. R. Meyer & Sons Co. et al. v. Grady et al. 194 Wis 615, 621, 217 NW 408, 411, the Supreme Court of Wisconsin in considering the question whether one Grady the operator of a stone crusher was an employee or an independent contractor said: "It must here be remembered that Grady was an expert in operating the crusher; that to perform the work about the crusher required from three to four men in addition to the two men employed in operating the engine and the crusher; that he was not only familiar with his own work, but was also competent to direct the other employees. In fact, Johnson, the superintendent, testified that Grady also acted in the capacity of a foreman. Under these circumstances, the reason why Johnson and Driesen did not give specific directions to Grady becomes apparent. Directions were unnecessary, because Grady was an expert in his field. A person may be an employer and liable as such for injuries to an employee, under the Workmen's Compensation Act (St 1925, Sec 102.01–102.41), even though he does not direct the work of the employees, as long as he possesses the power to direct."

In Madix v. Hochgreve Brewing Co., 154 Wis 448, 143 NW 189, the court said: "In Pickens & Plummer v. Diecker, (21 Ohio St 212) supra, it was pointed out that it was not necessary that the employer should in fact exercise control. It was sufficient if he had authority to do so, and the fact that the employer chose to leave the details to the servant because of the confidence in his ability and knowledge of the work to do what was proper was immaterial. In Linnehan v. Rollins, (137 Mass 123), supra, instructions to the effect that 'it is the possession of the right of interference, the right of control, the puts upon a party the duty of seeing that the person who stands in that relation does his duty properly,' and 'the absolute test is not the exercise of power of control but the right to exercise power of control,' were approved upon appeal. Other significant characteristics of an independent contractor are that he is usually engaged in carrying on an independent employment or business and

customarily contracts to do a given piece of work for a specified sum of money and is responsible for the result thereof, while a servant usually works by the hour, day, week, or month and is not responsible for the result of the work beyond performing his own labor in a workmanlike manner."

Where several persons are constructing a building it is obvious that there must be a leader or boss if the work is to progress in an orderly manner. The work could not progress in an orderly manner, if at all, if five or six men were engaged in constructing a building and each decided for himself what he should do and how he should do it. If a crew of men were so situated it would be only natural that one of them should be selected or assume the role of a leader.

As was said by the Supreme Court of New Jersey: "Whether the master retain the superintendence and management of his business, or withdraws himself from it and devolves it on a vice principal or representative, it is quite apparent that, although the master or his representative may devise the plans, engage the workmen, provide the machinery and tools, and direct the performance of work, neither can, as a general rule, be continually present at the execution of all such work. It is the necessary consequence that the mere execution of the planned work must be intrusted to workmen, and, where necessary, to groups or gangs of workmen, and in such case that one should be selected as the leader, boss, or foreman, to see to the execution of such work. This sort of superiority of service is so essential and so universal that every workman, in entering upon a contract of service, must contemplate its being made use of in a proper case. He therefore makes his contract of service in contemplation of the risk of injury from the negligence of a boss or foreman, as well as from the negligence of another fellow workman. The foreman or superior servant stands to him, in that respect, in that precise position of his other fellow servants." O'Brien v. American Dredging Co., 53 NJL 291, 21 Atl 324.

Schmidt had decided to rebuild the barn and had selected a site. He went to see Messer to obtain his services. He testified that he "told Messer what kind of a barn" he wanted

to build; that it "was a hip roof barn," that he "just wanted a barn so and so" and "told him (Messer) the size of it." He did not further particularize as to the directions he gave Messer as to the building to be constructed. It was understood between them, however, that Schmidt would be present while the building was being constructed and would be in position to see that his ideas and instructions were being carried out. Schmidt asked Messer if he could get help, and when Messer came to Schmidt's farm he was accompanied by two men who had worked with Messer on former occasions and who wanted to work. Schmidt was present. He had procured the necessary materials and they proceeded to construct the foundation with Schmidt taking an active part in the work. Schmidt continued to be present, and, with a few minor absences, worked all the time Messer was there. He observed Messer's work and what he was doing. Apparently Schmidt's original instructions were being carried out. There is no contention that he had made complaint or had any complaint to make as to the way the work was being done. The directions which it is said that Messer gave to the workers were merely such as would be given by a foreman or boss of a crew engaged in such construction. A foreman does not become an independent contractor,—a foreman is a fellow servant or co-employee of the men in the crew. Ell v. N. P. Ry. Co., 1 ND 336, 48 NW 222, 12 LRA 97, 26 ASR 621; Alaska Treadwell Gold Mining Co. v. Whelan, 168 US 86, 42 L ed 390; Baruch v. Sapp, 178 F2d 382, 13 ALR2d 1131; Barnaby v. Sears Roebuck & Co., 132 Kan 447, 295 Pac 715; Nelson v. Stukey, 89 Mont 277, 300 Pac 287, 78 ALR 483. In Ell v. N. P. Ry. Co., supra, this court held that the foreman of a gang who had authority to employ and discharge and to superintend the work by the persons employed in the performance of the work for which they were employed was a fellow servant of the persons so employed and working as a member of the gang under the direction of the foreman.

In Alaska Treadwell Gold Mining Co. v. Whelan, supra, the court held: "A mere foreman or boss of a gang of men working in a mine, employed in the same department of business, and under a common head, is a fellow servant with them, whether

he has or has not authority to engage and discharge the men under him."

It is frequently a matter of difficulty to determine whether a person who has been engaged to perform certain work for another is a servant or an independent contractor. Certain tests have been adopted to be applied in the determination of the question whether a person who has entered upon the performance of certain work for another should be classed as a servant of the person for whom the work is performed or as an independent contractor. In Peterson v. Christenson, 141 Neb 151, 3 NW2d 204, the court speaking through Chief Justice Simmons reaffirmed the following statement which the court had made in a former decision: " 'The true test of a "contractor" would seem to be, that he renders the service in the course of an independent occupation, representing the will of his employer only as to the result of his work and not as to the means by which it is accomplished. . . . In actual affairs an independent contractor generally pursues the business of contracting, enters into a contract with his employer to do a specified piece of work for a specific price, makes his own subcontracts, employs, controls, pays and discharges his own employees, furnishes his own material and directs and controls the execution of the work. Where these conditions concur there is, of course, no difficulty in determining his character as such. It is only where one or more of them is lacking that a question arises. The one indispensable element to his character as an independent contractor is that he must have contracted to do a specified work and have the right to control the mode and manner of doing it.' "

Messer was not a contractor, he was a workman,—a carpenter. He had entered into a contract to construct a building. He had entered into agreements to perform work on the job for an hourly or daily wage. The agreement between Messer and Schmidt was one for personal service,—an agreement that Messer should perform personal service for Schmidt for an hourly wage, in the building of the barn. Messer did not enter into a contract with Schmidt to do a specified piece of work for a specific price. He did not furnish his own material. He was not free to select and employ the men to perform work in the

building of the barn. It was understood that Schmidt should be permitted to work himself and also that neighbors with whom Schmidt had made an arrangement for exchange of labor should work. The testimony does not disclose the exact number of the persons that worked on the construction of the barn under such exchange arrangement but it does show that at least four such persons worked on the construction of the building and that Schmidt himself worked from the beginning and with very few brief absences continued to work until the construction terminated. The testimony shows that Schmidt had requested or at least suggested that Messer bring some help. Schmidt entered upon the work at the very outset and worked in the construction of the foundation. He continued to work and was working with Rudolph Burkhardt shingling the roof when Burkhardt fell from the roof on June 9, 1944. There is no contention that Messer had given any direction as to the work on the roof. According to Schmidt's testimony he removed the board that had been nailed on the roof as a safeguard to prevent men who worked on the roof from sliding off the roof.

Reference has been made to the testimony of Yeager; he was apparently called to show that Messer was a contractor. The form and nature of the questions propounded by claimants' attorney indicate that it was sought to show that Yeager had surrendered control over the work and the workers to Messer. Yeager, however, gave his own testimony. He testified that before the men started to work he talked to all of them about their wages. That he did not talk to Messer alone but talked to them all as a group. He testified that the workers agreed that one was "to keep track" of the time and that he asked Messner to keep track. He testified that he expected to be absent while the work was being done, and that he wanted this information. He testified that the workers were all paid on an hourly basis and that as he recalled Messer was paid ten cents an hour more than the other workmen because he furnished the tools for use of the other workers. He testified that he paid each of the workers by check. When asked if he had the right to fire any of them he answered, "I felt that way about it." That he could have discharged Burkhardt without talking to Messer and could have

discharged Messer. That he expected Messer to tell each of the men what to do. In amplifying this he said: "Well, I tell you. When you take a bunch of men like these fellows—that is the first time he was a carpenter—in fact they were all new carpenters so you couldn't—" at this point the witness was interrupted by another question propounded by claimants' counsel. Apparently Yeager was about to explain that in the circumstances it was necessary to have someone to act as foreman or boss. The interruption prevented his completing the answer he was giving. Yeager's testimony clearly indicates that the relationship between him and Messer was that of employer and employee and not that of contractee—independent contractor.

In Rait v. New England Furniture and Carpet Co., 66 Minn 76, 68 NW 729, the court has occasion to determine whether there was evidence to sustain a verdict predicated upon the fact that a party who performed certain work for the defendant was an employee and not an independent contractor. The trial court submitted the question to a jury, and the jury by its verdict found that the party who had undertaken the work was an employee and not an independent contractor. The defendant moved for a new trial. The motion was denied and the defendant appealed. The Supreme Court of Minnesota sustained the order denying a new trial in an opinion written by Judge Mitchell, one of the ablest judges of the court of last resort of any of the states. In such opinion the court said:

"The action was brought to recover for personal injuries caused by the alleged negligence of the defendant in throwing ice and snow from the roof of its building into the street below, which struck the plaintiff as he was passing by, and caused the injuries complained of. It is not denied that the question whether the act itself was negligent was, under the evidence, for the jury. But the main question litigated was whether the person who was having the snow and ice removed was or was not an independent contractor. The trial court submitted that question to the jury as one of fact. The contention of the defendant is that the court should have held, as a matter of law, that the party was an independent contractor. This presents the only ques-

862

tion which we find it necessary to consider. The building in question was occupied by the defendant as a furniture store. Defendant had been annoyed by the roof leaking, caused by the accumulation of ice and snow, and the president of the company employed one Dinsmore, whose general occupation was that of contractor and builder, to repair the roof, so as to stop the leak. The only evidence as to the terms of the contract of employment is the testimony of the president and Dinsmore. The president's testimony was as follows: 'Q. Well, you asked him if he could stop that leak, did you? A. I did. He said, "I can." "Well," I says, "if you can, I will be very much obliged to you. I wish you would go ahead and stop it. If you will go ahead and stop it, and not bother me about the details of it, I shall be under great obligations to you; and, when you get it done, bring in your bill, and I will pay it." Mr. Dinsmore says, "I can fix it for you, and I will go ahead as you tell me to." "Well," I says, "go ahead, and don't bother me about it. Fix it up, and bring me the bill." ' Dinsmore testified as follows: 'Q. What was that conversation, Mr. Dinsmore? A. As I remember it, Mr. Harris came along on the sidewalk. I was out in front of my place, and he spoke about the leaks in his roof, and the ice, the water running down the face of the building on the First avenue side, and forming ice there, and which made it a very bad affair,—a very bad thing for the building, and also for the goods inside. And he wanted to know if I couldn't fix it, and I told him that I thought I could. And he says, "Well, if you can, you go ahead and do it." And that was the sum and substance of it. Q. Did you agree to go ahead and do it? A. I told him that I would do it.' While nothing was said in this conversation in regard to removing the ice and snow, yet it is clear that it was understood by both parties that this was necessary to be done, and was part of the work which Dinsmore was to do as preparatory to repairing the roof. In pursuance of this contract, Dinsmore went on to do the work, and employed a man to go up on the roof, and remove the ice and snow. It was this man who threw down into the street the ice and snow which injured the plaintiff. The president of the defendant gave no directions during the prog-

ress of the work as to how it should be done, and, when it was completed, paid Dinsmore's bill. The defendant did not surrender to Dinsmore the possession or control of its building, but continued to occupy it and carry on its mercantile business in it as usual. Its officers and employes, as well as the public that traded there, continued to enter and depart from it as before. . . . Under all the circumstances, it was, at least, a question for the jury to say whether, in employing Dinsmore to fix this roof, the defendant surrendered all control over his actions as to the manner of removing the ice and snow from the roof of the building."

In Jensen v. Industrial Accident Commission, 57 Calif App 680, 207 Pac 1019, a brick mason, named Scott, was employed by Jensen, a building contractor, to build fireplaces of a specified size. Jensen furnished all materials. Scott furnished his own tools and engaged the men working with him and charged only union scale of wages and the usual foreman's fee. Mortar splashed into Scott's eye while he was engaged in plastering with resultant injury. The Industrial Accident Commission held that Scott was an employee and not an independent contractor and hence was entitled to compensation under the Workmen's Compensation Act. The court affirmed the award. In the opinion in the case the court said:

"Scott charged no percentage and received no other compensation for his work than the union scale of wages, which was $11 a day, plus the usual charge, of $1 a day for the duties performed by him as foreman." Scott's charges were based upon said union scale of wages for himself and the men working with him.

In Franks v. Carpenter et al., 192 Ia 1398, 186 NW 647, the court had under consideration the question whether a person who had entered into an engagement to put in a certain sewer was the employee of the person for whom the sewer was being constructed or was an independent contractor. One Carpenter had entered into a contract to do certain plumbing in a school building then in process of erection and had also engaged to construct a sewer line from a septic tank near the schoolhouse to a line of tiling some distance away. Carpenter entered into

an agreement with one Hudson, who occasionally had contracted to put in sewers, to put in the sewer. Hudson engaged one Franks to assist him in the work and transported him to the place where the work was to be done. Franks was killed as a result of the caving of the sides of the excavation. Application was made for compensation under the Workmen's Compensation Act on behalf of Franks' minor daughter.

"Hudson had previously been employed on other jobs by Carpenter. He evidently knew him to be efficient in making excavations and laying sewers. The arrangement between Hudson and Carpenter was that the former would go to Conroy, secure such help as was necessary, make the excavation, and lay the sewer pipe or tile so as to connect the septic tank with the tile drain already installed. In addition to Franks, Hudson secured the assistance of two other men. He acted as foreman, provided the work, kept the time and determined the number of and what hours the men should work each day, and notified Carpenter of the amount required to pay their wages. Hudson and each of the men employed on the job received 50 cents per hour. Hudson furnished his own tools with which to do the work, but did not furnish any of the material used therein. Carpenter was not present while the work was being done, and did not, in fact, direct Hudson, or the men employed with him, as to how the work should be done. He did, however, advise Hudson that they should commence the excavation at the tile drain, which they did. In addition to 50 cents per hour for his time, Carpenter paid Hudson for oil and gas used in his automobile for 12 days and also paid him for the use of his automobile in taking Franks to Conroy. The arbitration board found in favor of the claimant. This finding was sustained on review by the Industrial Commissioner and upon appeal thereto by the district court."

It was contended that the evidence showed that Franks "at the time of his death, was an employee of Hudson, an independent contractor, and not of Carpenter." After referring to tests to be applied in determining whether one is an employee or an independent contractor and "whether the contract reserves to the proprietor the power of control over the employee," the court said:

"Applying this test to the facts of the case before us, we conclude that the finding of the commissioner that at the time of his death both Franks and Hudson were employees merely of Carpenter is fully sustained by the evidence. Carpenter, at the time Hudson was employed by him, knew that Hudson understood the work of constructing sewers and would be a good man to place in charge of the work at Conroy. Nothing was said between Carpenter and Hudson as to the manner of doing the work, nor is there anything in the contract or arrangement between them, or the manner in which it was carried out, to indicate that Carpenter in any respect waived his right to control or direct the time or manner of making the excavation and laying the drain. There was no occasion for any specific reservation of this right. It is true that Carpenter was not present at any time during the progress of the work, but, manifestly, he had the right to discharge Hudson, Franks, or any other employee on the job and to absolutely direct Hudson in everything he did in the work of putting in the drain. The fact that he refrained from doing so is not of controlling importance. Hudson furnished none of the material and was paid 50 cents per hour for his time, the same as the other employees. He assumed the position of foreman, but this was clearly contemplated by Carpenter at the time of his employment. The tools furnished by Hudson were simple tools, and under his contract with Carpenter, he assumed no liability and incurred no financial responsibility. He stood no chance to make a profit or to suffer a loss. He kept the time of himself and the other men, delivered it to Carpenter, who gave or sent him a check for the amount shown thereby to be due the men. Hudson distributed the money sent him by Carpenter only. . . .

"Significance is also given by counsel for appellants to the fact that Hudson and the men employed with him determined how they work should be done, the number of hours they would work each day, at what time they would begin, and at what time they should quit and what time they would take at noon for lunch. These were all matters within the control of Hudson as foreman. There was nothing in the contract between Hudson

and Carpenter to prevent the latter from fixing the time for the men to commence work and the number of hours they should work each day. He simply refrained from doing so and left it all to the discretion of Hudson. This did not make him an independent contractor. . . . Employees are often in charge of, and under the control of, a foreman, superintendent, or other agent of the employer. . . . We are of the opinion that, notwithstanding he (Hudson) was in charge of the employment of the men working on the sewer and directed the manner in which the work should be done, he did not do this as an independent contractor, but as the foreman and representative of the appellant."

The Workmen's Compensation Act provides:

"Where one performs service for another for a remuneration, whether the same is paid as a salary, commission, or otherwise, the person performing such service is presumed to be an employee of the person for whom the services are performed until the contrary is shown. NDRC 1943, 65–0103.

"Every person found performing the work of another is presumed to be in the employment of the person whose work is being done, who has the burden of showing that relation of master and servant did not exist." (Syl 3), Broaddus v. Long, 125 SW2d 340, 135 Tex 353; Gibson v. Gillette Motor Transport, (Texas), 138 SW2d 294.

"The fact that one is performing labor for another is *prima facie* evidence of employment, and such person is presumed to be a servant in the absence of evidence to the contrary." (Syl 2), Robinson v. George et al., 105 P2d 914, 16 Cal2d 238.

Certain factors are looked to by the courts to aid in the determination of whether a person who has entered upon the performance of certain work for another should be classed as a servant of the person for whom the work is performed or as an independent contractor. Among the factors or elements to be considered is the place where the work is done, and the ownership and the control of such premises. The fact that the work is done upon premises owned by the employer indicates that the relationship is that of employer and employee and not

of contractee—independent contractor. Simila v. Northwestern Improvement Co., 73 Wn 285, 131 P 831; Swam v. Aetna Life Insurance Co. 155 Wn 402, 284 P 792; Washington Recorder Publishing Co. v. Ernst, 199 Wn 176, 91 P2d 718.

In Washington Recorder Publishing Co. v. Ernst, supra, the court said: "One of the several common law tests or elements considered in the determination of the relationship between the parties is the place where the work is to be done. If the work is done upon the premises of the employer the inference is strong that the workmen are employees and not independent contractors. If a person is employed to work on the premises of another and for that other's benefit such other person is, presumptively, an employee; and the burden is upon the one engaging the services of such person to establish the independence of the employee."

The control of the premises where the work is being done is also a factor to be considered and the fact that the person for whom the work is being done retains and has control of the premises indicates that the relation between the parties is that of employer and employee. 71 CJ 458.

Another factor to be considered in determination of the relationship of the parties is the manner in which the compensation to the worker is measured. The fact that the measure of compensation is based upon the time that the worker works, as on an hourly, daily or weekly basis, indicates that the relationship is that of employer and employee. 71 CJ 472, 474; Industrial Commission v. Hammond, 77 Colo 414, 236 P 1006; Fox Park Timber Co. v. Baker, 53 Wyo 467, 84 P2d 736, 120 ALR 1020; C. R. Meyer & Sons Co. v. Grady, 194 Wis 615, 623, 217 NW 408, 411; Peterson v. Christenson, 141 Neb 151, 3 NW2d 204; Thompson v. Twiss, 90 Conn 444, 97 Atl 328, LRA 1916E 506; Press Publishing Co. v. Industrial Accident Commission, 190 Calif. 114, 121–122; Rouse et al v. Town of Bird Island, 169 Minn 367, 368, 211 NW 327. On the other hand where the agreement is to do work for a specified or fixed sum and the measure of compensation is based upon a lump sum for the entire task the worker is usually a contractor. 71 CJ 472. In Industrial Commission v. Hammond, supra, the court said:

"The measure of compensation is also important, for where it is based upon time or piece the workman is usually a servant, and where it is based upon a lump sum for the task he is usually a contractor."

In C. R. Meyer & Sons Co. v. Grady, supra, the court said: "One of the usual and ordinary tests, and in many instances, the decisive test, which stamps one engaged in performing work an employee rather than an independent contractor, is the fact that wages are paid, and that upon an hourly, daily, or weekly basis."

In Peterson v. Christenson, supra, the court said: "The evidence supports a holding that there was an implied condition of the contract that plaintiff was to be paid for his labor at the rate of 65 cents an hour. The amount of his compensation would depend upon, not the completion of the job, but the length of time required to perform the job. This is indicative of an employee status."

In Thompson v. Twiss, supra, the court said:

"The method of payment adopted by these parties, by the day rather than by the contract, is characteristic of the relation of an employee to an employer and not of an independent contractor with his contractee. So, too, it was characteristic of such an employment that the work to be done was not definite, that the price was not a fixed sum, and that it did not include a profit upon the work or upon the wages of the men." 90 Conn at pp 448-449.

The fact that the person who performs the work is to furnish materials for the work is a factor indicating that the worker is an independent contractor. And conversely the fact that he does not do so but that the employer does has been named as a factor showing him to be an employee. 71 CJ 469; Industrial Commission of Colorado v. Bonfils, 78 Colo. 306, 241 Pac 735.

The absence of profit to the worker upon the job upon the work of others employed on it and the fact that the sum paid to him is wages and not profits are indications that he is an employee rather than an independent contractor. 71 CJ 476; Thompson v. Twiss, supra; Morgannelli's Estate v. City of Derby, 105 Conn 545, 135 Atl 911; Barker v. Bemidji Wood Products Co. 184 Minn

366, 238 NW 692. Messer "was getting wages for his work; not making profits on a contract." Barker v. Bemidji Wood Products Co. 184 Minn at p 370, 238 NW at p 693. "His time belonged to his employer, and he was entitled to be paid irrespective of results." Pickens & Plummer v. Diecker and Brother, 21 Ohio St Rep 212, 215.

The agreement between Schmidt and Messer provided for service by Messer in person. It clearly contemplated that he should perform, and be paid for, service which he performed personally. He could not assign the contract, or delegate the work to a substitute, without the consent of Schmidt. 71 CJ 464.

In Ronning et al. v. Carter et al., 185 Wis 384, 200 NW 652, the court said:

"An independent contractor is at liberty, unless the terms of the contract otherwise provide, to assign the contract or to engage others to carry out the same. . . . In the instant case, it is clear that it was the understanding of the parties that Carter was to perform these services in person, and that his contract amounted to one of personal service. . . . An independent contractor ordinarily is not paid at the rate received by employees. There enters into such a contract, to some extent, the element of speculation, and the contractor has in mind a consideration which is larger than that received by the ordinary employee."

The agreement between Schmidt and Messer was one for personal service by Messer. Obviously the agreement could not be assigned by Messer, nor could he delegate the work to a substitute, without the consent of Schmidt. There was no understanding or agreement as to the length of time that Messer should work or as to the probable aggregate amount of his wages. The only understanding was that Schmidt would pay Messer an hourly wage, the same as the other workers who were to be paid wages, with fifteen cents per hour in addition for the use of the tools which Messer furnished for the use of all the workers. Messer was to receive no other compensation than his hourly payments. If the agreement between Schmidt and Messer was such as the majority say then Messer was to receive a smaller take home pay than the other workers because

out of the wages he received he would be requird to pay the premium payments to the Workmen's Compensation Bureau, based upon the wages paid to the other workers.

The important test in determining whether a person employed to do certain work is an independent contractor or a servant is the control over the work which is reserved by the employer.

"The fact that one performs personal services for another, for an agreed compensation, carries with it the presumption, of the right of control and discharge by the employer or beneficiary of the services." Gibson et al. v. Gillette Motor Transport, Inc., (Tex.) 138 SW2d 293; NDRC 1943, 65–0103.

At the outset a person who desires to have certain work done, say to have a building constructed, and who enters into a contract with another to construct the building has the right or power of control over the work, and continues to have such right or power unless and until he relinquishes it. He may surrender the right of control to the person who is engaged to perform the work or he may retain it. If the agreement for the performance of the work is silent as to the right of control, it is presumed that the employer has reserved it. In this case nothing was said between the parties as to the right of control. The work was to be performed on premises owned and occupied by Schmidt. He was to furnish all materials necessary for the construction of the building and he did furnish all such materials. Schmidt was to be present where and when the work was to be performed and to participate in the work himself. He was present and did participate in the work. Schmidt had the right to assign persons selected and paid by himself as workers in constructing the barn and he did assign such persons and they performed work. All the workers were to be furnished board by Schmidt and Messer and the two men that Messer brought with him to work on the construction were to be furnished, and were furnished, lodging on the premises. Messer and the two men who came with him were to be paid, and were paid, wages on an hourly basis. Messer's compensation was measured by the hours that he worked personally. He received no profit from the work of any of the other workers. He was not to receive any compensation in addition to the hourly wage upon

the completion of the building. Before the work commenced Schmidt had informed Messer generally as to the building to be constructed, its location and size. In referring to what he told Messer he said, "I just wanted a barn so and so." He does not particularize as to what he meant by "a barn so and so," but presumptively he imparted to Messer what he had in mind. Schmidt was to be present and participate in the work and thus have opportunity to observe what transpired. He was present. He had opportunity to give any instructions or orders that he might have desired. He gave none and his testimony fails to disclose that he had any occasion to give any order or direction or that he had a single objection to voice to anything that transpired. Messer testified that he was foreman and Schmidt when first examined by a member of the Workmen's Compensation Bureau also stated that Messer was the foreman. Even though no direction was given to Messer, he did act as leader or boss and there was no objection by Schmidt. He was satisfied with what transpired. Apparently the directions Schmidt had given in the beginning were being carried out, and he had no complaint of what was being done or any orders or directions to give. It was his barn that was being built. He was paying Messer on an hourly basis for the service he was rendering. He was present and observed what was being done. If Messer had been incompetent and wasteful and detrimental practices had been carried on, it is not likely that Schmidt would have remained silent and permitted such practices to continue, and it is quite apparent from Messer's testimony that any order or direction that Schmidt might have seen fit to give with respect to the work, including an order discharging Messer from the work, would have been obeyed. The continuation of the work depended upon necessary materials being furnished by Schmidt. Schmidt could have terminated the work at any time by withholding materials. When sufficient shingles were not available, the work stopped and both Schmidt and Messer treated the work as terminated. As Schmidt testified he paid everything in full, and he thereafter proceeded to finish or have the building finished without the help of Messer. It seems clear that when the evidence in this case is considered in light of, and together

·with, applicable presumptions that there is ample evidence from which the triers of fact could find that Messer was an employee of Schmidt. " 'Whether or not the right of control existed is ordinarily a question of fact for the jury, and is usually arrived at by inference from the terms of the contract, the character of the employment, and all relevant facts and circumstances. When the facts are in dispute, or more than one inference can be drawn therefrom, the question is for the jury.' " LaBree v. Dakota Tractor and Equip. Co., 69 ND 561, 288 NW 476. The question becomes one of law for the court only where the evidence is reasonably susceptible of only a single inference. 27 Am Jur 540.

The members of the Workmen's Compensation Bureau heard and saw the witnesses as they testified.. They had an opportunity to observe their appearance on the witness stand and also the manner in which the witnesses were examined, the form of questions that were propounded and the answers given. This was not a novel experience for such members. In the course of the performance of their duties they had conducted numerous similar hearings where similar questions were involved. As was said by this court in State ex rel Craig v. N. Dak. Workmen's Compensation Bureau, 53 ND 649, 655, 207 NY 555, 557:

·"From the very nature of its function, the bureau, a continuing body, must necessarily investigate great numbers of personal injury cases of every conceivable character. Its members cannot become otherwise than more or less expert themselves in matters relating to personal injuries. The bureau was the judge of the weight of the evidence and the credibility of the witnesses who testified before it."

The applicable statutes contemplate no review of the Bureau's determination as to the facts except to ascertain whether there is evidence to support the findings or there is no evidence to support them.

The record bears ample evidence of the eminent fairness of the members of the Bureau. The claimants were afforded every opportunity to produce evidence and to examine witnesses, including Messer whom the claimants sought to hold liable for compensation for the death of Burkhardt. The hearing was con-

tinued from time to time. The attorney for the claimants was permitted to examine the witnesses without any limitation either as to the length of examination or the form of questions propounded. After all the testimony and evidence had been submitted and considered the members of the Workmen's Compensation Bureau unanimously reached the conclusion that the evidence failed to show that Burkhardt was an employee of Messer but that on the contrary the evidence established that Burkhardt was an employee of Schmidt. The district judge before whom the appeal was tried carefully considered and analyzed all the evidence and he reached the conclusion that the findings of fact of the Workmen's Compensation Bureau were fully supported by and in accord with the evidence. The right of appeal from a determination by the Workmen's Compensation Bureau upon an application for compensation is statutory, and is governed by the applicable statutory and constitutional provisions. 58 Am Jur, Workmen's Compensation, Sec 523, p 899. Crandall v. N. Dak. Workmen's Compensation Bureau, 53 ND 636, 207 NW 551; State ex rel. Craig v. N. Dak. Workmen's Compensation Bureau, supra; N. D. Const. Sections 103, 86.

As has been pointed out, where on an appeal from a determination of the Workmen's Compensation Bureau the findings of fact are challenged the judicial inquiry goes no farther than to ascertain whether there is evidence in support of the findings. Unless the court finds that "the findings of fact made by the agency (Workmen's Compensation Bureau) are not supported by the evidence," it is the duty of the court to affirm the decision of the Bureau. NDRC 1943, 28–3219. If appeal is taken from the decision of the district court, the sole question presented to this court is whether the decision of the district court is clearly wrong. In my opinion the decision of the district court involved on this appeal is correct and should be affirmed.

In the majority opinion it is asserted that the findings of fact are insufficient. This question was not raised before the Workmen's Compensation Bureau or before the district court on appeal nor has it been raised on the appeal to this court. It is raised for the first time in the majority opinion. In the claim which formed the basis of the proceeding before the Workmen's

Compensation Bureau it was averred that Burkhardt was an employee of Val Messer. Nothing was said, except the statement that he was an employee of Val Messer. On the hearing before the Bureau there was only one ultimate question presented, namely, whether Burkhardt was an employee of Messer. In the course of the hearing there was further advanced by the claimants the subordinate contention that Val Messer was an independent contractor and consequently that Burkhardt in performing work on the construction of Schmidt's barn was an employee of Messer. The Bureau made findings of fact that "Rudolph Burkhardt at the time of the injury resulting in his death was an employee of John Schmidt" and also made a similar conclusion of law. In the notice of appeal to the district court there was no claim that the findings of fact were insufficient. In the specifications of error it was said that "Rudolph Burkhardt became employed by one Val Messer in the month of June, 1944, for the purpose of helping said Val Messer construct a barn at the request of one John Schmidt of Richardton, North Dakota, who hired the said Val Messer to construct said building and the said Val Messer having employed the said decedent to assist him therein." It is further stated "that the Workmen's Compensation Bureau further erred in finding that the claimant has failed to prove that she is entitled to participate in the Workmen's Compensation Fund" and "that the Workmen's Compensation Bureau erred in finding that the said Rudolph Burkhardt was at the time of the injury resulting in his death an employee of John Schmidt." The claimants and their attorney apparently had no difficulty in understanding the findings. There was no complaint as to the sufficiency of the findings. The complaint was as to the facts found. If the claimants deemed the findings to be insufficient, they had available an adequate remedy by requesting the Bureau to make additional findings as to specific subsidiary or evidential facts. Ruud v. Minneapolis Street R. Co., 202 Minn 480, 279 NW 224; State ex rel Probst v. Haid, 333 Mo 390, 62 SW2d 869; Prairie Oil & Gas Co. v. King, 109 Okla 213, 235 Pac 522. See, also, Garr, Scott & Co. v. Spaulding, 2 ND 414, 51 NW 867. It must be presumed that if such request had been made the Bureau would

have made such appropriate additional findings as they found to be established by the evidence. 42 Am Jur, Public Administrative Law, p 580 et seq.

As has been pointed out it is the function of the Workmen's Compensation Bureau to hear the testimony of witnesses, pass upon their credibility, weigh the testimony and make reasonable deductions therefrom. The courts are not authorized to weigh the evidence and make findings of fact. The district court on appeal is authorized to review and weigh the evidence only to the extent of determining whether the findings of fact by the Workmen's Compensation Bureau are or are not supported by the evidence. If the findings by the Bureau are insufficient, the court has no authority to make findings.

In such circumstances the case should be remanded to the Bureau with appropriate directions in order that the Bureau may perform its duty and make the necessary findings of fact, "either with, or without, a new hearing of the parties as the exigencies of the case may be." Anno 146 ALR 197, 201.

On the record, and in the circumstances of this case, the judgment appealed from should be affirmed.